# Attachment 2

No. 17-4148

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

UNITED STATES OF AMERICA
*Plaintiff - Appellant*,

v.

KEMP & ASSOCIATES, INC. AND DANIEL J. MANNIX,
*Defendants - Appellees* .
_____

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF UTAH
Honorable David Sam
District Court No. 2:16-cr-00403-DS
_____

**OPENING BRIEF FOR THE
UNITED STATES OF AMERICA (CORRECTED)**
_____

MAKAN DELRAHIM
*Assistant Attorney General*

ANDREW C. FINCH
*Principal Deputy Assistant Attorney General*

MARVIN N. PRICE, JR.
*Acting Deputy Assistant Attorney General*

KALINA M. TULLEY            KRISTEN C. LIMARZI
ROBERT M. JACOBS            JAMES J. FREDRICKS
RUBEN MARTINEZ, JR.         ADAM D. CHANDLER
MOLLY A. KELLEY             JONATHAN H. LASKEN
  *Attorneys*                   *Attorneys*
  U.S. Department of Justice    U.S. Department of Justice
  Antitrust Division            Antitrust Division
                                950 Pennsylvania Avenue, NW
                                Room 3224
                                Washington, DC 20530-0001
                                202-305-7420

**Oral Argument Is Requested**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF RELATED CASES ...................................................... x

STATEMENT OF JURISDICTION ........................................................ 1

INTRODUCTION .................................................................................... 2

STATEMENT OF ISSUES FOR REVIEW ........................................... 4

STATEMENT OF THE CASE ................................................................. 4

    I.  The Conspiracy to Allocate Customers of Heir Location Services 5

    II. Proceedings and Decisions Below .................................................. 7

SUMMARY OF ARGUMENT ................................................................. 10

STANDARD OF REVIEW ...................................................................... 13

ARGUMENT ........................................................................................... 14

    I.  The Indictment Was Timely Because the Conspiracy Continued
        Through January 2014 as Demonstrated by the Receipt and
        Division of the Conspiracy's Proceeds up to this Date ............... 14

        A.  The Conspirators' Receipt and Division of the Conspiracy's
             Proceeds Continues the Conspiracy and Thus Delays the
             Start of the Statute of Limitations ......................................... 14

        B.  The District Court Erred by Concluding that the Conspiracy
             Ended When a Conspirator Signed the Final Allocated
             Customer ................................................................................. 18

    II. The District Court Erred by Dismissing the Grand Jury's Per Se
        Charge in Advance of Trial Because the Indictment Properly
        Charged a Per Se Violation ........................................................... 27

A. The Indictment Alleges a Per Se Unlawful Customer
   Allocation Agreement ...............................................28

B. The District Court Erred in Holding that the Indictment Did
   Not Allege a "Classic Customer Allocation" ...........................32

C. The District Court Erred in Holding that the Per Se Rule
   Could Not Apply Based on Its Conclusion that the Agreement
   Has the "Potential for Increased Efficiency" ..........................38

D. Section 3731 Provides Jurisdiction to Review the Rule of
   Reason Order, and If It Does Not, this Court Should Issue a
   Writ of Mandamus Correcting the Order's Profound
   Departure from Governing Law ...............................................47

   1. The District Court's Rule of Reason Order Is an Effective
      Dismissal Appealable Under Section 3731 ......................47

   2. Alternatively, the All Writs Act Provides this Court
      Authority to Issue a Writ of Mandamus Correcting the
      Lower Court's Departure from Well-Established Law .....52

CONCLUSION ..................................................................58

STATEMENT REGARDING ORAL ARGUMENT ................................59

CERTIFICATE OF COMPLIANCE .......................................60

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY
REDACTIONS ..................................................................61

CERTIFICATE OF SERVICE.................................................62

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Arizona v. Maricopa County Medical Society*,
    457 U.S. 332 (1982) ............................................................ 3, 36, 37, 38

*Board of Trade of City of Chicago v. United States*,
    246 U.S. 231 (1918) ............................................................ 28

*Blue Cross & Blue Shield United of Wisconsin
    v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995) .............................. 30

*Braverman v. United States*, 317 U.S. 49 (1942) ................................... 24

*Business Electronics Corp. v. Sharp Electronics Corp.*,
    485 U.S. 717 (1988) ............................................................ 28, 29

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986) ............................................................ 41

*Catalano, Inc. v. Target Sales, Inc.*,
    446 U.S. 643 (1980) ............................................................ 32, 39

*Cheney v. U.S. District Court for D.C.*,
    542 U.S. 367 (2004) ............................................................ 54, 56

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984) ............................................................ 44

*Fiswick v. United States*,  329 U.S. 211 (1946) ...................................... 25

*General Leaseways, Inc. v. National Truck  Leasing Ass'n*,
    744 F.2d 588 (7th Cir. 1984) .................................................. 39

*Grunewald v. United States*, 353 U.S. 391 (1957) .................................... 15

*Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774
  (7th Cir. 1994) ..........................................................30, 31, 34

*Hyde v. United States*, 225 U.S. 347 (1912)............................................24

*Iannelli v. United States*, 420 U.S. 770 (1975) ..................................24, 26

*In re Cooper Tire & Rubber Co.*,  568 F.3d 1180 (10th Cir. 2009)..........53

*In re Cox Enterprises, Inc.*, 871 F.3d 1093 (10th Cir. 2017) ...................29

*In re Dresser Industries, Inc.*, 972 F.2d 540 (5th Cir. 1992)...................53

*In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300
  (3d Cir. 2010)..........................................................................49, 50

*In re Sulfuric Acid Antitrust Litigation*,
  703 F.3d 1004 (7th Cir. 2012).............................................................44

*In re United States*, 397 F.3d 274 (5th Cir. 2005).......................53, 55, 56

*In re United States*, 578 F.3d 1195 (10th Cir. 2009)..................54, 55, 56

*In re United States*, 900 F.2d 800 (5th Cir. 1990)...................................52

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007).......................................................................28, 38

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008) .................................................................44

*National Society of Professional Engineers v. United States*,
  435 U.S. 679 (1978).............................................................................41

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery
  & Printing Co.*, 472 U.S. 284 (1985)................................................29, 38

iv

*Northern Pacific Railway Co. v. United States*,
  356 U.S. 1 (1958) ...................................................................... 37

*Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990) ............... 3, 11, 27, 31

*Polk Bros., Inc. v. Forest City Enterprises, Inc.*,
  776 F.2d 185 (7th Cir. 1985) ............................................... 41, 42, 46, 50,

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986) ............................................................ 42

*SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958
  (10th Cir. 1994) ................................................................... 29, 38

*Skilling v. United States*, 561 U.S. 358 (2010) ....................................... 50

*Smith v. United States*, 568 U.S. 106 (2013) ........................................... 13

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) ................................................. 33

*Timken Roller Bearing Co. v. United States*,
  341 U.S. 593 (1951) .............................................................................. 44

*United States v. A-A-A Electrical Co., Inc.*,
  788 F.2d 242 (4th Cir. 1986) ........................................................ 16, 26

*United States v. Anderson*, 326 F.3d 1319
  (11th Cir. 2003) ................................................................ 16, 20, 23, 25

*United States v. Andreas*, 216 F.3d 645 (7th Cir. 2000) ......................... 33

*United States v. Armstrong*, 517 U.S. 456 (1996) .................................. 50

*United States v. Bergman*, 746 F.3d 1128 (10th Cir. 2014) ............. 48, 51

*United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998) ...................... 50, 51

*United States v. Brighton Building & Maintenance Co.*,
   598 F.2d 1101 (7th Cir. 1979)..............................................29

*United States v. Cadillac Overall Supply Co.*,
   568 F.2d 1078 (5th Cir. 1978)........................................34, 35

*United States v. Consolidated Laundries Corp.*,
   291 F.2d 563 (2d Cir. 1961) ...............................................34

*United States v. Coop. Theatres of Ohio, Inc.*,
   845 F.2d 1367 (6th Cir. 1988)..............................................36

*United States v. Cote*, 51 F.3d 178 (9th Cir. 1995)...................................52

*United States v. Davis*, 766 F.2d 1452
   (10th Cir. 1985) ......................................................17, 26

*United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989) ...................passim

*United States v. Dynalectric Co.*, 859 F.2d 1559
   (11th Cir. 1988) .......................................15, 16, 20, 23

*United States v. Evans & Associates Construction Co.*,
   839 F.2d 656 (10th Cir. 1988).......................................passim

*United States v. Evans & Associates Construction Co.*,
   1987 WL 9899 (W.D. Okla. Jan. 22, 1987).........................................21

*United States v. Farnsworth*, 456 F.3d 394 (3d Cir. 2006).....................52

*United States v. Flom*,
   558 F.2d 1179 (5th Cir. 1977).......................................31, 34

*United States v. Giles*, 213 F.3d 1247 (10th Cir. 2000)...........................13

*United States v. Girard*, 744 F.2d 1170
(5th Cir. 1984) .......................................................................... 16, 19, 24

*United States v. Green*, 592 F.3d 1057 (9th Cir. 2010) .......................... 45

*United States v. Grimm*, 738 F.3d 498 (2d Cir. 2013)............................ 26

*United States v. Hall*, 20 F.3d 1084 (10th Cir. 1994)............................. 13

*United States v. Hetrick*, 644 F.2d 752 (9th Cir. 1980)........................... 52

*United States v. Higdon*, 638 F.3d 233 (3d Cir. 2011) ...................... 55, 56

*United States v. Inryco, Inc.*, 642 F.2d 290 (9th Cir. 1981) .............. 15, 16

*United States v. Kane*, 646 F.2d 4 (1st Cir. 1981).................................. 52

*United States v. Kissel*, 218 U.S. 601 (1910) ............................... 15, 25, 27

*United States v. Koppers Co.*, 652 F.2d 290 (2d Cir. 1981).................... 29

*United States v. Levasseur*, 846 F.2d 786 (1st Cir. 1988) ................. 50, 51

*United States v. Martin Linen Supply Co.*,
430 U.S. 564 (1977)............................................................................. 48

*United States v. Martin*, 783 F.2d 1449 (9th Cir. 1986) .................. 14, 19

*United States v. McVeigh*, 106 F.3d 325
(10th Cir. 1997) ........................................................................... 53, 54

*United States v. Metro. Enterprises, Inc.*,
728 F.2d 444 (10th Cir. 1984)....................................................... 35, 36

*United States v. Morgan*, 748 F.3d 1024 (10th Cir. 2014)............. passim

*United States v. Northern Improvement Co.*,
    814 F.2d 540 (8th Cir. 1987) ............................................................. 16, 19

*United States v. Northern Improvement Co.*,
    632 F. Supp. 1576 (D.N.D. 1986) ...................................................... 22

*United States v. Oakar*, 111 F.3d 146 (D.C. Cir. 1997) ........................... 51

*United States v. Phillips*, 869 F.2d 1361 (10th Cir. 1988) ................ 14, 19

*United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010) ..................... 45, 46

*United States v. Prescon Corp.*, 695 F.2d 1236 (10th Cir. 1982) ............ 48

*United States v. Qayyum*, 451 F.3d 1214 (10th Cir. 2006) ............... 13, 15

*United States v. Reicher*, 983 F.2d 168 (10th Cir. 1992) ................... 28, 35

*United States v. Scott*, 437 U.S. 82 (1978) ............................................. 48

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ........................................................... 36, 37, 39, 40

*United States v. Suntar Roofing, Inc.*, 897 F.2d 469
    (10th Cir. 1990) ............................................................ 3, 11, 12, 27, 30

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978) ......................... 39

*United States v. Walker*, 653 F.2d 1343 (9th Cir. 1981) ................. passim

*United States v. Wexler*, 31 F.3d 117 (3d Cir. 1994) ............. 54, 55, 56, 57

*United States v. Williams*, 449 F.3d 635 (5th Cir. 2006) .................. 48, 51

*United States v. Wilson*, 420 U.S. 332 (1975) ........................................ 48

## FEDERAL STATUTES, AND RULES

15 U.S.C. § 1 ......................................................................... passim

18 U.S.C.:
  § 3231.................................................................................... 1
  § 3282(a) ........................................................................ 14, 23
  § 3731................................................................................ passim

28 U.S.C. § 1651.................................................................. 2, 52

Federal Rules of Appellate Procedure:
  4(b)(1)(B)............................................................................. 1
  21(a)(1)............................................................................... 52

## MISCELLANEOUS

Jonathan O'Connell et al., *Halt to the Search for New FBI Building Prompts Frustration*, Wash. Post, July 11, 2017..................................37

Thomas O. Barnett, Assistant Attorney Gen.,
  Antitrust Div., U.S. Dep't of Justice, Criminal Enforcement of
  Antitrust Laws: The U.S. Model (Sept. 25, 2006) ...............................49

U.S. Dep't of Justice, Antitrust Div., Antitrust Division Manual,
  at III-12 (5th ed. 2017)..........................................................49

## STATEMENT OF PRIOR AND RELATED CASES

There are no prior or related cases to this appeal.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this criminal prosecution under 18 U.S.C. § 3231.  On August 28, 2017, the district court entered 1) an order dismissing the indictment as barred by the statute of limitations and 2) an order that the case is not subject to the per se rule (but is instead subject to the rule of reason) for purposes of determining whether the conduct charged in the indictment violates Section 1 of the Sherman Act, 15 U.S.C. § 1.  A133-A143.[1]  The government filed a timely notice of appeal from both orders on September 26, 2017.  Fed. R. App. P. 4(b)(1)(B).

This Court has appellate jurisdiction to review the first order under 18 U.S.C. § 3731.  Section 3731 also provides appellate jurisdiction over the second order.  *See infra* pp. 47-51.  If this Court concludes that it does not have appellate jurisdiction over the second order, the government respectfully requests that the Court construe the pertinent parts of this brief as a petition for a writ of mandamus, which

---

[1] Citations to the appellant's appendix take the form of A##.

the Court has the authority to issue under the All Writs Act, 28 U.S.C.

§ 1651.  *See infra* pp. 52-57.

## INTRODUCTION

This appeal arises from two orders erroneously dismissing an

indictment charging a company, Kemp & Associates, Inc., and one of its

executives, Daniel J. Mannix, with conspiring with a competitor to

suppress and eliminate competition by allocating customers in violation

of Section 1 of the Sherman Act, 15 U.S.C. § 1.

In the first order, the district court dismissed the indictment as

untimely based upon its erroneous conclusion that the conspiracy

ceased when the last customer was allocated, even though the

conspirators continued to collect payments under the allocated customer

contracts and shared those payments with each other.  The order is in

direct conflict with this Court's precedents, which reject exactly that

view.  In *United States v. Evans & Associates Construction Co.*, this

Court held that a Sherman Act conspiracy to suppress or eliminate

competition for contracts continues until a conspirator accepts "the last

payment on the contract."  839 F.2d 656, 661 (10th Cir. 1988).  And

thus, when a conspirator receives "any money" from an allocated

2

contract, "that [is] sufficient to delay the start of the statute" of limitations. *Id.* In *United States v. Morgan*, this Court held that conspiracy continues at least until the "distribution of the proceeds of a conspiracy" is complete. 748 F.3d 1024, 1036-37 (10th Cir. 2014). Here, the conspirators received payments and distributed the proceeds from the allocated contracts within the limitations period, as the defendants conceded below.

In the second order, the court wrongly precluded the government from proceeding to trial under its sole theory of liability: that the conduct alleged in the indictment is a per se illegal restraint of trade. It is well established that customer allocation agreements are subject to condemnation under the per se rule. *See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (per curiam); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473 (10th Cir. 1990). The district court identified no sound basis for ignoring controlling precedent and departing from the per se rule here, and there is none. Its order "quite obviously is inconsistent" with binding precedent. *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 349 (1982).

## STATEMENT OF ISSUES FOR REVIEW

1.     Whether the district court erred in concluding that the five-year statute of limitations bars an indictment alleging that the members of a conspiracy to allocate customers received, and distributed among themselves, the proceeds from the allocated customer's contracts within five years of indictment.

2.     Whether the district court erred in concluding that the per se rule does not apply to the alleged conspiracy to allocate customers because of the defendants' assertions that the conspiracy 1) applied only to new customers, 2) affected a small part of society, 3) arose in a unique and unusual industry, and 4) had efficiency-enhancing potential.

## STATEMENT OF THE CASE

On August 17, 2016, a District of Utah grand jury returned a one-count indictment charging Kemp & Associates, Inc., and its Director of Operations and Vice President/COO, Daniel Mannix, with conspiring "to suppress and eliminate competition by agreeing to allocate customers of Heir Location Services sold in the United States," in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  A18.  The

indictment alleged that the conspiracy lasted from at least September 1999 to January 29, 2014. *Id.*

## I.   The Conspiracy to Allocate Customers of Heir Location Services

Providers of heir location services offer individuals who may be heirs to intestate estates the services associated with securing their inheritance. The providers identify such heirs "and, in exchange for a contingency fee, develop evidence and prove [the] heirs' claims to an inheritance in probate court." A17. Potential heirs who have not yet signed contracts with, and thus are not yet a customer of, an heir location service provider may receive offers from one or more such providers. *Id.* If multiple providers identify the same unsigned potential heir, one of the ways they may compete to sign the heir is by offering "more attractive contingency fee rates." *Id.*

The defendants and a competing heir location service provider[2] conspired to suppress and eliminate competition between them for these

---

[2] Richard A. Blake, Jr., the owner and president of the other heir location service provider, pleaded guilty to the same conspiracy as charged in the indictment at issue in this appeal. *See United States v. Blake*, No. 1:16-cr-00025, Dkt. No. 21 (N.D. Ill. Mar. 8, 2016).

5

unsigned heirs, including competition on contingency fee rates, "by

agreeing to allocate customers of Heir Location Services sold in the

United States."  A18.  The conspirators "agreed . . . that when both co-

conspirator companies contacted the same unsigned heir to an estate,

the co-conspirator company that first contacted that heir would be

allocated certain remaining heirs to that estate who had yet to sign a

contract with an Heir Location Services provider."  A19.  In exchange

for a portion of any contingency fees collected by the first company, the

second company agreed not to compete for the business of that heir and

certain other unsigned heirs to the same estate.  *Id*.  Pursuant to this

allocation, the first company would "submit[] offers to provide Heir

Location Services, which included contingency fee rate quotations, to

potential heirs" it first contacted, while the second company would

"refrain[] from submitting offers and quotations to potential heirs"

allocated to the first company.  *Id*.  The first company signed the

allocated customers at noncompetitive prices, proved the heirs' claim to

the estate, and collected from them "collusive and noncompetitive"

contingency fees.  A19-A20.  After the fees were collected, the first

company paid to the second "a portion of the contingency fees ultimately collected from those allocated heirs" pursuant to the agreement.  A19.

The indictment charged that the conspiracy continued as late as January 29, 2014.  A18.  And it alleged that the conspirators "carr[ied] out the [charged] conspiracy" by, among other things, accepting payments for heir location services sold to heirs at collusive contingency fee rates and making payments to, and receiving payments from, each other.  A18-A20.  Defendants concede that such payments continued into the limitations period.  *See also* A194.

## II.   Proceedings and Decisions Below

On March 31, 2017, the defendants filed a "Motion For Order That The Case Be Subject To The Rule Of Reason And To Dismiss The Indictment."  A147-A203.  The motion requested: 1) an order that the government cannot proceed to trial under the per se rule but must instead try the case under the rule of reason, 2) an order dismissing the indictment because the Due Process Clause precludes a criminal prosecution under the rule of reason, and 3) an order dismissing the indictment as barred by the statute of limitations.  A153.

The motion invited the court to look beyond the indictment's allegations by including documentary exhibits and descriptions of the defendants' ongoing data analysis that defendants assert show the nature and effect of the conspirators' agreement. *See generally* A153, A184-A186, A213-A215, A216-A217, A226-A229. The government opposed the motion and the consideration of these factual matters outside the indictment. A239, A250; *see also* A56-A57.

On June 21, 2017, the district court (Sam, J.) held a hearing on the motion. At the hearing, the court stated that its ruling "will be" that this "is a Rule of Reason case because it is unique and unusual," "doesn't affect a very large part of our society," is "just very narrowly focused," and "doesn't seem to me to fit the classic Sherman Antitrust Act type cases." A81-A82. The court asked the defendants to prepare an order for the court to sign. A84. The court reserved ruling on the statute of limitations issue and did not mention the Due Process issue. A82-A84.

On July 14, 2017, the government filed a motion seeking reconsideration of the oral ruling, objecting to the defendants' proposed order, and requesting a ruling on the statute of limitations issue. In

particular, the government asked the court to "reconsider its holding

that the per se rule does not apply to the conspiracy as charged"

because it conflicted with binding precedent holding a customer

allocation agreement is per se unlawful, and any decision that the

conduct was something other than the charged, per se unlawful

agreement improperly resolved factual disputes related to the ultimate

issue in the case.  A87-A98.

On August 28, 2017, the district court adopted the defendants'

proposed order verbatim, A133-A136, denied the government's motion

for reconsideration, and granted the defendants' motion to dismiss the

indictment as time barred, A137-A143.  In the Rule of Reason Order,

the court concluded that the per se rule does not apply to this case

because the challenged agreement 1) arose in a unique and unusual

industry, 2) applied only to new customers, 3) affected a small part of

society, and 4) contained efficiency-enhancing potential.  A137-A143.  In

the Limitations Order, the court concluded that this case was time

barred because the conspiracy ended in 2008, after the initial allocation

of the last estate subject to the agreement.  A137-A143.  In the same

order, the court denied reconsideration based upon its reasoning at the hearing and in the Rule of Reason Order.  *Id.*

On September 26, 2017, the government noticed its appeal of both orders.

## SUMMARY OF ARGUMENT

Two erroneous rulings by the district court that contravene controlling precedent of this Court (and the Supreme Court) have brought the prosecution of this straightforward per se illegal customer allocation conspiracy to a halt.

First, the court dismissed the indictment as untimely, mistakenly concluding that it ended when the last customer was allocated and no additional competition was eliminated, even though the conspirators continued to collect payments under the contracts with allocated customers and to divide those payments within five years of indictment. In *United States v. Evans & Associates Construction Co.* (*Evans*), 839 F.2d 656, 661 (10th Cir. 1988), this Court reversed a district court for making the very same mistake.  The Court unequivocally held that the conspirators' continued receipt of the proceeds of a Sherman Act conspiracy, including the last payment on an affected contract,

10

demonstrated that the conspiracy continued and thus delayed the commencement of the limitations period.  Here, the district court and the defendants offered no valid basis to distinguish *Evans*, and there is none.  In every relevant respect, the indictment in *Evans* parallels the indictment here.

The district court's dismissal also contravenes this Court's holding in *United States v. Morgan*, 748 F.3d 1024, 1036-37 (10th Cir. 2014), that a conspiracy continues at least until the distribution of its proceeds.  The court and defendants again offered no valid reason (and there is none) why the distribution by the conspirators of the proceeds from the contracts with the allocated customers does not demonstrate that the conspiracy continued into the limitations period here.

Second, the district court erroneously concluded that the charged customer allocation conspiracy should be analyzed under the rule of reason and not condemned as per se illegal, if proven.  But binding precedent holds that customer allocation agreements are, as a category, per se illegal and thus condemned without further inquiry into their reasonableness.  *See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (per curiam); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469,

11

473 (10th Cir. 1990).  The charged customer allocation conspiracy cannot be removed from this per se category based on defendants' (disputed) assertions, even if true, that the allocation applied only to new customers, affected only a small number of estates, arose in an obscure industry, or contained purportedly efficiency-enhancing potential.  By doing so, the district court contravened this Court's and the Supreme Court's precedent.

This Court has the power to correct the district court's errors under 18 U.S.C. § 3731.  That section provides that an order is appealable if it formally dismisses an indictment (as the Limitations Order does), or if the order does not formally dismiss the indictment but is nonetheless tantamount to a dismissal by having that effect or foreclosing a distinct theory of liability (as the Rule of Reason Order does).  But even if this Court concludes that Section 3731 does not provide jurisdiction over the Rule of Reason Order, the government respectfully requests that the Court treat the relevant parts of this brief as a petition for writ of mandamus.  In this case, the antitrust issue is so fundamental, the error so manifest, and review otherwise so elusive, that the extraordinary remedy of mandamus is fully warranted.

## STANDARD OF REVIEW

This Court reviews *de novo* a decision dismissing an indictment as barred by the statute of limitations, including "the district court's legal conclusion concerning the scope of the conspiracy." *United States v. Qayyum*, 451 F.3d 1214, 1218 (10th Cir. 2006). The grand jury "need not" charge facts establishing the timeliness of the action; the statute of limitations is an affirmative defense and not an element of the crime. *Smith v. United States*, 568 U.S. 106, 112 (2013).

This Court reviews *de novo* the district court's Rule of Reason Order as a dismissal for failure to allege a per se offense. *United States v. Giles*, 213 F.3d 1247, 1248-49 (10th Cir. 2000); *United States v. Hall*, 20 F.3d 1084, 1088 (10th Cir. 1994). (If the Court concludes that this order is not an appealable dismissal under 18 U.S.C. § 3731, then the standard applicable to a mandamus petition applies, *see infra* pp. 53-54.)

This Court "must" assume "the indictment's allegations are true" "at this stage of the proceedings." *Qayyum*, 451 F.3d at 1219. The indictment "should be read in its entirety, construed according to common sense and interpreted to include facts which are necessarily

13

implied." *United States v. Phillips*, 869 F.2d 1361, 1364 (10th Cir. 1988)

(quoting *United States v. Martin*, 783 F.2d 1449, 1452 (9th Cir. 1986)).

## ARGUMENT

**I.    The Indictment Was Timely Because the Conspiracy
       Continued Through January 2014 as Demonstrated by the
       Receipt and Division of the Conspiracy's Proceeds up to
       this Date**

The district court erred in dismissing the indictment's single

Sherman Act conspiracy count as untimely.  The district court

committed this error because it mistakenly concluded that the alleged

conspiracy ended after the last customers were allocated, rather than

continuing as long as the conspirators collected and distributed

payments from the contracts with the allocated customers.  This

conclusion conflicts with well-established precedent in this Circuit and

others holding that conspiracies continue as their members collect and

distribute the conspiracies' proceeds, that is, until the last contractual

payment is received or divided by the conspirators.

**A. The Conspirators' Receipt and Division of the
    Conspiracy's Proceeds Continues the Conspiracy and Thus
    Delays the Start of the Statute of Limitations**

The Sherman Act offense charged here is subject to the five-year

statute of limitations provided by 18 U.S.C. § 3282(a).  A Sherman Act

conspiracy prosecution is timely if the conspiracy exists within the relevant limitations period, which, in this case, is the five-year period beginning August 18, 2011, A16-A21. *See Grunewald v. United States*, 353 U.S. 391, 396-97 (1957). An indictment's allegations determine the scope of the conspiracy. *Qayyum*, 451 F.3d at 1218. The indictment here alleges a Sherman Act conspiracy to allocate customers by having one conspirator make the allocated customer a contractual offer while the other refrains from making a competing offer. Such a conspiracy "remains actionable until its purpose has been achieved or abandoned, and the statute of limitations does not run so long as the co-conspirators engage in overt acts designed to accomplish its objectives." *United States v. Inryco, Inc.*, 642 F.2d 290, 293 (9th Cir. 1981); *see United States v. Kissel*, 218 U.S. 601, 607 (1910).

"Every circuit," including this one, "that has addressed th[e] issue has concluded that a criminal conspiracy to restrain trade by collusive, anti-competitive bidding continues for the purposes of the five year statute of limitations until either the final payments are received under the illegal contract or the final distribution of illicit profits among the conspirators occurs." *United States v. Dynalectric Co.*, 859 F.2d 1559,

15

1565 (11th Cir. 1988).[3]  In *United States v. Evans & Assocs. Const. Co.*

(*Evans*), this Court held that a Sherman Act conspiracy to suppress or

eliminate competition for contracts does not end when the contract or

contracts are obtained, but continues until a conspirator "accepted the

last payment on the contract."  839 F.2d 656, 661 (10th Cir. 1988).

Thus, the receipt of "any money" by any conspirator from an allocated

contract is "sufficient to delay the start of the statute" of limitations.

*Id.*

Likewise, in *United States v. Morgan*, this Court held that "the

distribution of the proceeds of a conspiracy is an act occurring during

---

[3]  *See United States v. Anderson*, 326 F.3d 1319, 1328 (11th Cir. 2003); *United States v. N. Improvement Co.*, 814 F.2d 540, 541-44 (8th Cir. 1987); *United States v. A-A-A Elec. Co.*, 788 F.2d 242, 245-46 (4th Cir. 1986); *Inryco*, 642 F.2d at 293-95; *see also United States v. Walker*, 653 F.2d 1343, 1346-47 (9th Cir. 1981) (holding that a conspiracy to defraud the government by rigging bids for timber contract did not end with the contract's award "because the agreement itself aimed beyond merely defeating the government process of competitive bidding and encompassed the ultimate objective of making excess profits to be shared among the co-conspirators"); *United States v. Girard*, 744 F.2d 1170, 1172-74 (5th Cir. 1984) (holding that conspiracy to defraud by rigging bids to secure contract did not end with the contract's award but continued as conspirator accepted contractual payments because his "interest lay not in securing the contract itself, but in obtaining the money thereunder").

the pendency of the conspiracy." 748 F.3d 1024, 1036-37 (10th Cir.

2014) (quoting *United States v. Davis*, 766 F.2d 1452, 1458 (10th Cir.

1985)). And thus, the distribution of proceeds also delays the start of

the statute of limitations.

The indictment alleged that defendants engaged in a conspiracy

"to suppress and eliminate competition by agreeing to allocate

customers of Heir Location Services," which continued until "January

29, 2014." A18. The indictment further alleged that the conspiracy's

purpose was carried out by, among other things, the conspirators: 1)

submitting offers and withholding offers to potential customers, 2)

accepting payments for the services sold to the allocated customer at

collusive and noncompetitive contingency fee rates, and 3) paying a

portion of these payments to the co-conspirator company or receiving a

portion of these payments from the co-conspirator company. A19-A20.

In this way, the conspirators received payments on the allocated

contracts and distributed those proceeds among themselves. Indeed,

defendants do not dispute that some of these acts—receipt and division

of the conspiracy's proceeds—were performed within five years of the

indictment's filing. *See also* A194. Thus, under controlling precedent,

17

*Evans*, 839 F.2d at 661; *Morgan*, 748 F.3d at 1036-37, the indictment was timely.

### B. The District Court Erred by Concluding that the Conspiracy Ended When a Conspirator Signed the Final Allocated Customer

In concluding that the indictment was untimely, the district court committed the same mistake that this Court corrected in *Evans*.  The district court erroneously held that the conspiracy ended when the conspirators ceased allocating future customers because the court mistakenly believed that the conspiracy's purpose did not include collecting payments on contracts with allocated customers or dividing those payments.  A141-A142.  The district court in *Evans* likewise believed that the statute of limitations began to run at the moment competition was eliminated, which, in that bid-rigging case, was "when the bids were let."  839 F.2d at 661.

This Court reversed, holding that the statute does not begin to run on a criminal Sherman Act conspiracy "until after the successful contractor accepted the last payment on the contract."  *Id.*  The Court explained that the "Sherman Act violation was 'accomplished both by the submission of noncompetitive bids *and* by the request for and

18

receipt of payments at anti-competitive levels.'" *Id.* (quoting *Northern Improvement*, 814 F.2d 540 at 543 n.2 ); *see also Northern Improvement*, 814 F.2d at 542 ("[T]he object and purpose of this illegal agreement was 'illicit gain,' the receipt of payments, and we conclude that the district court erred in holding that the purpose of the conspiracy terminated the moment the bids were submitted.").

As in *Evans*, when the indictment here is "'read in its entirety'" and "'construed according to common sense,'" *Phillips*, 869 F.2d at 1364 (quoting *Martin*, 783 F.2d at 1452), it is apparent that the conspirators' receipt and distribution of the proceeds from the contracts with allocated customers were within the scope of the conspiracy.  The Court is "not deal[ing] here with criminal behavior that is an end in itself," but rather "[c]ommon sense tells us that the conspirators' purpose was to reap the benefit of the conspiracy: to be awarded [the heir location service] contracts at anti-competitively high prices and to be paid for those contracts." *Northern Improvement*, 814 F.2d at 542; *see also Girard*, 744 F.2d at 1172-73.  Indeed, courts have found it "inconceivable . . . that any business would conspire to restrain trade solely for the sake of restraining trade," as the "attendant battery of

19

civil and criminal penalties for antitrust violations simply is too
threatening to convince us that anybody would attempt to restrain
trade without also having the further goal of financial self-enrichment
by virtue of the restraint of trade." *Dynalectric*, 859 F.2d at 1568; *see
Anderson*, 326 F.3d at 1328 (holding that the "conspiracy continued
until the conspirators received the full economic benefits anticipated by
their bid-rigging scheme," including payment on a contract they bid on
seven years earlier).

There is no basis for the district court's conclusion that "economic
enrichment" was the purpose in *Evans* but not here.  A141.  Its
conclusion cannot be based on "the evidence in *Evans*" showing "that
the central purpose of the conspiracy was to obtain wrongful proceeds or
money," *id.*, because there was no evidence in *Evans*: this Court
reversed a pre-trial dismissal of the indictment.

The district court's conclusion also cannot be based on any
difference between the indictments here and in *Evans*.  The indictments
in both cases charge a conspiracy to suppress competition whose
substantial term was the mechanism by which the conspirators

eliminated competition.[4]  And both indictments alleged that the

conspirators suppressed and eliminated competition by coordinating

their offers for contracts.[5]  They both also identified receipt of payments

as a means of effectuating the conspiracy, and neither explicitly alleged

that the conspiracy's purpose was "economic enrichment."  A141.[6]

---

[4] *Compare* A18 (*Kemp* Indictment ¶¶ 9-10) (alleging "conspiracy . . . in unreasonable restraint of" trade, in which defendants conspired "to suppress and eliminate competition by agreeing to allocate customers of Heir Location Services sold in the United States," and for which the "substantial terms" were "to allocate customers of Heir Location Services sold in the United States"), *with* Indictment ¶¶ 13-14, *United States v. Evans & Assocs. Constr. Co.*, 1987 WL 9899 (W.D. Okla. Jan. 22, 1987) (No. CR-86-77-E) ("*Evans* Indictment"), *available at* https://www.justice.gov/atr/page/file/1018136/download (alleging "conspiracy in unreasonable restraint of" trade, "a substantial term of which was to submit collusive, noncompetitive and rigged bids to, or to withhold bids from, the Oklahoma Department of Transportation").

[5] *Compare* A19 (*Kemp* Indictment ¶ 11(g)), *with Evans* Indictment ¶ 14.

[6] *Compare* A18, A20 (*Kemp* Indictment ¶ 11, 11(i)) (alleging that, "[f]or the purpose of forming and carrying out the combination and conspiracy alleged in this indictment," the defendants "accepted payment for Heir Location Services sold to heirs in the United States at collusive and noncompetitive contingency fee rates"), *with Evans* Indictment ¶ 15, 15(e) (alleging that acts done "[f]or the purpose of forming and effectuating the aforesaid combination and conspiracy" included "[r]eceiving and accepting from the Oklahoma Department of Transportation payments for work performed on the aforementioned Federal-Aid highway construction project").

*Evans* thus cannot be distinguished on the basis of the indictments'

allegations because in all relevant respects the two indictments are

parallel.[7]

The charged conspiracy in *Evans* also cannot be distinguished on

the ground that it involved rigging "the bid for one contract which was

bid, granted, completed and fully paid within the two years," while the

customer allocation agreement here rigged the offers for "269 allegedly

affected estates."  A142.  Nothing in *Evans* supports the notion that had

the defendants there rigged the bidding for numerous contracts, their

more extensive conspiracy would not have continued to the last

payment received, but rather would have ended—perhaps earlier than

the actual one-contract conspiracy—when the last of the contracts was

let.

In any event, imposing artificial limits on the time for, or the

number of, payments received that qualify as overt acts in furtherance

---

[7] A comparison with the indictment in *Northern Improvement* yields
the same conclusion.  *Compare* A18-A20 (*Kemp* Indictment ¶¶ 9-11),
*with* Indictment ¶¶ 18-19, *United States v. N. Improvement Co.*, 632 F.
Supp. 1576 (D.N.D. 1986) (Crim. No. C3-85-062), *available at*
https://www.justice.gov/atr/page/file/1018141/download.

of a conspiracy makes no sense and has no statutory basis.  It would

have courts arbitrarily deciding case-by-case how many payments were

too many or what period of time for payments was too long, thus

depriving both the government and defendants of any certainty on

when the statute of limitations ran.[8]  This does not mean that there is

"significant arbitrariness regarding the length of the limitations

period."  A142.  The limitations period is five years.

18 U.S.C. § 3282(a).  What varies is how long the conspiracy continues,

which always depends on the conspirators' agreement and actions.  For

a Sherman Act conspiracy, this Court has held that the conspiracy

continues at least until a conspirator commits the last act in

furtherance, including a conspirator accepting the last payment on an

affected contract.  The number of contracts or the duration of their

performance makes no difference.

---

[8] In fact, the payment period in several cases cited is comparable to or greater than here.  *See Anderson*, 326 F.3d at 1325-26 (contract bid July 2, 1989; final payments received September 20, 1996); *Dynalectric*, 859 F.2d at 1562 (subcontract bid September 7, 1979; final payment received January 24, 1985); *Walker*, 653 F.2d at 1344 (contract bid June 23, 1972; timber cut and paid for in August and September 1975).

It would also make no difference if the district court were correct that the payments on their face appeared to be "ordinary, non-criminal events." A142. The receipt of the payment in *Evans* appears just as ordinary and non-criminal as the receipt of payments here. An act's superficially "ordinary" or "non-criminal" appearance is irrelevant because acts "innocent, indeed, of themselves" take on their "criminal taint from the purpose for which they were done." *Hyde v. United States*, 225 U.S. 347, 360 (1912); *see also Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975) ("[T]he act can be innocent in nature, provided it furthers the purpose of the conspiracy."); *Braverman v. United States*, 317 U.S. 49, 53 (1942) (explaining that an overt act "may be that of only a single one of the conspirators and need not be itself a crime"); *Girard*, 744 F.2d at 1174 ("Even though the acceptance [of payment], in and of itself, was perfectly legal, it still satisfies the requirement of an overt act because of the agreement's illegal purpose.").

Lastly, quoting out-of-circuit precedent, the district court purports to distinguish *Evans* because, in its view, the "'unique threats to society posed by a conspiracy'" here have passed. A141 (quoting *United States v. Doherty*, 867 F.2d 47, 62 (1st Cir. 1989)). But unlike *Doherty*—a case

24

about stolen police promotion exams and higher police salaries—*Evans* and the conspiracy charged here involve the collection of a final payment on an affected contract in furtherance of a Sherman Act conspiracy.  If *Doherty* were interpreted to hold that the unilateral collection of such a payment cannot continue a conspiracy like the one here, then it would conflict with this Court's holding in *Evans*.  Likewise, if *Doherty* were interpreted to hold that such payment's collection were the mere "results of [the] conspiracy" and not "actual conduct in furtherance of it," *id.*, *Doherty* would again conflict with *Evans*.[9]

In any event, even assuming *Doherty* were relevant here (which it is not), it does not support the district court's ruling.  The "distinct danger[]" posed by conspiracy is "collective" or "[c]oncerted" action, which includes continued cooperation in the form of payoffs and

---

[9] *See also Anderson*, 326 F.3d at 1328 (rejecting defendant's contention that "payment was not an *overt act* in furtherance of the conspiracy but merely the *result* of the conspiracy"); *Walker*, 653 F.2d at 1347 (rejecting defendant's view of "payment . . . and division of profits on the [rigged contracts for] timber as merely the continuing *result* of the conspiracy" and concluding that "the conspiracy was a continuing one within the meaning of *Kissel* and *Fiswick* [*v. United States*, 329 U.S. 211 (1946)]").

distributions of proceeds among the conspirators. *Iannelli*, 420 U.S. at 778. *Doherty* itself recognized that the "special societal dangers of conspiracy" existed when "the payoff itself required cooperation; for instance . . . in *Walker*, 653 F.2d at 1347, the realization and division of profits required 'continuing cooperation.'"[10]

Indeed, while the *Evans* indictment alleged only that a single conspirator "received payments" within the limitations period and that "no division of these payments among the conspirators" was made, 839 F.2d at 661, the indictment here does allege division of spoils in addition to receipt of payments. A19-A20 (*Kemp* Indictment ¶ 11(f) (division of proceeds), ¶ 11(i) (receipt of payments)). It "'is well settled that the distribution of the proceeds of a conspiracy is an act occurring during the pendency of the conspiracy.'" *Morgan*, 748 F.3d at 1036 (quoting *Davis*, 766 F.2d at 1458). This well-established rule makes perfect sense: If conspirators are actively making payments to each

---

[10] 867 F.2d at 61-62; *see United States v. Grimm*, 738 F.3d 498, 504 n.6 (2d Cir. 2013) (explaining that *A-A-A Electric* and *Walker* are consistent with *Doherty*'s approach because they involve continued concerted action in the form of "payoffs to co-conspirators [that] continued after [the] award of [the] contract" and continued division by the conspirators of "profits from [the] scheme on a yearly basis").

other for their role in the conspiracy, then the conspiratorial agreement

must still be in place.[11]  For this reason too, the indictment was timely.

## II.   The District Court Erred by Dismissing the Grand Jury's Per Se Charge in Advance of Trial Because the Indictment Properly Charged a Per Se Violation

The district court erred when it barred the government from

proceeding to trial on the charged per se offense.  The indictment

charges an agreement among horizontal competitors to allocate

customers.  The Supreme Court and this Court have long recognized

that such an agreement "constitutes a *per se* violation of § 1 of the

Sherman Act." *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473

(10th Cir. 1990); *see Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50

(1990) (per curiam).  The district court's departure from the binding

precedent of this Court and the Supreme Court is unjustified and

threatens to undermine the government's ability to prosecute antitrust

conspiracies that have long been condemned as per se illegal.

---

[11] *See Walker*, 653 F.2d at 1347-48 (recognizing that payoffs among conspirators are "a material element of the agreement" because failure to make such a payment would be a "breach[]" of the conspiratorial agreement); *cf. Kissel*, 218 U.S. at 607 (explaining that the statute of limitations does not begin to run so long as there is "continuous co-operation of the conspirators to keep [the conspiracy] up").

27

## A. The Indictment Alleges a Per Se Unlawful Customer Allocation Agreement

Section 1 of the Sherman Act outlaws any "contract, combination . . . , or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Courts have long interpreted this language to prohibit only "unreasonable" restraints of trade. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988); *United States v. Reicher*, 983 F.2d 168, 170 (10th Cir. 1992). Most restraints are analyzed under the rule of reason, which requires the plaintiff to present evidence of a restraint's anticompetitive effects and permits the defendant to present procompetitive justifications. Ultimately, the fact-finder weighs all the circumstances to determine whether the restraint is one that suppresses competition or promotes it. *See Bd. of Trade of City of Chi. v. United States*, 246 U.S. 231, 238 (1918).

Restraints that have been deemed to be unlawful per se—such as the customer allocation agreement at issue here—are not analyzed under the rule of reason. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). "The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint." *Id.* Such

28

treatment is reserved for categories of restraints that are manifestly

anticompetitive and "'would always or almost always tend to restrict

competition.'" *Bus. Elecs. Corp.*, 485 U.S. at 723 (quoting *Nw.*

*Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S.

284, 289-90 (1985)).  "[N]o offsetting economic or efficiency justifications

salvag[e]" a restraint that is deemed per se unlawful.  *SCFC ILC, Inc. v.*

*Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994).

Thus, "[u]nder a per se rule, plaintiffs prevail simply by proving

that a particular contract or business arrangement . . . exists." *In re*

*Cox Enters., Inc.*, 871 F.3d 1093, 1097 (10th Cir. 2017); *see also United*

*States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir. 1981) ("In cases

involving behavior such as bid rigging, which has been classified by

courts as a per se violation, the Sherman Act will be read as simply

saying: 'An agreement among competitors to rig bids is illegal.'"

(quoting *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101,

1106 (7th Cir. 1979))).

This Court—relying on "the analysis of the Supreme Court," its

own prior holdings, and decisions of other circuits—has held that an

"agreement to allocate or divide customers between competitors within

29

the same horizontal market" is a per se violation of the Sherman Act. *Suntar Roofing*, 897 F.2d at 473 (collecting cases). An agreement not to compete for certain customers is manifestly anticompetitive because it forces the allocated customer to "face[] a monopoly seller" rather than reap the benefits of competition between conspirators that would result in lower prices or better product offerings. *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 782 (7th Cir. 1994). Such an agreement to "rotate or otherwise allocate customers among the conspirators" has effects "almost identical to those of price-fixing and is treated the same by the law." *Id.*; *see also Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) ("It would be a strange interpretation of antitrust law that forbade competitors to agree on what price to charge, thus eliminating price competition among them, but allowed them to divide markets, thus eliminating all competition among them.").

In *Hammes*, a group of five transmission repair dealers allegedly agreed to jointly advertise their services and list five phantom dealers. 33 F.3d at 777. "A call to one of the five numbers is automatically forwarded, in accordance with a preexisting agreement, to one of the

30

dealers in the pool." *Id.* The court concluded that "[s]uch an out-and-out scheme of customer allocation would be a per se violation of section 1" because, absent this automatic call forwarding scheme, customers would "have a real and not merely theoretical choice between dealers." *Id.* at 782 (citing *Palmer*, 498 U.S. 46). Similarly, in *United States v. Flom*, the court held that it was "a per se violation of the Sherman Act" for re-bar suppliers to "allocate[] the business on upcoming construction contracts among their respective companies" by selecting the winning conspirator and having the others submit higher bids or no bids at all. 558 F.2d 1179, 1182-83 (5th Cir. 1977).

In the same way, defendants have entered into an equally straightforward customer allocation scheme. Defendants agreed that, "when both co-conspirator companies contacted the same unsigned heir to an estate, the co-conspirator company that first contacted that heir would be allocated certain remaining heirs to that estate." A19. The first company then submitted an offer, while the second company "refrained from submitting offers and quotations to potential heirs." *Id.* Like the defendants in *Hammes* and *Flom*, defendants have eliminated competition at precisely the point at which competition for unsigned

31

heirs might otherwise occur: when the co-conspirators each contact the
same heir.  Rather than reap the benefits of such competition, heirs are
forced to face a single seller.

That the conspirators continued to compete to be the first
company to contact an heir cannot save their agreement from per se
condemnation.  As the Supreme Court explained in *Catalano*, an
agreement "extinguishing one form of competition among the sellers" is
condemned as per se unlawful regardless of the potential for
competition in other forms.  *Catalano, Inc. v. Target Sales, Inc.*, 446
U.S. 643, 649 (1980) (per curiam).  Defendants here have agreed to
eliminate competition on contingency fee rates at the precise moment at
which such competition would take place.  That agreement falls into a
category found to be manifestly anticompetitive and, thus, is illegal per
se.

### B.  The District Court Erred in Holding that the Indictment Did Not Allege a "Classic Customer Allocation"

The district court recognized that the charged agreement was an
agreement to allocate customers, A135, but erred by refusing to apply
the per se rule, in contravention of binding precedent.  The court said it
could not "predict with any confidence, and does not believe, that the

32

[agreement] operated as a classic customer allocation" because it 1) was structured in an "unusual way" in that it applies to new customers, 2) impacted only a "small number of estates," and 3) occurred in a "relatively obscure industry." *Id.*  But whatever doubts the district court may have about treating a particular customer allocation agreement as per se unlawful or about categorizing customer allocations as per se unlawful, the Supreme Court has held that such agreements are per se unlawful, and it is the Supreme Court's "prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).

The indictment alleges that defendants engaged in a prototypical customer allocation agreement.  But even if it did not, the fact that a particular "agreement to divide the market" does "not fit precisely the characterization of a prototypical *per se* practice does not remove it from *per se* treatment." *See United States v. Andreas*, 216 F.3d 645, 666-67 (7th Cir. 2000).  None of the features identified by the district court justify departure from the per se rule.

1.  There is no exception to the per se rule for allocations of new customers, and thus the district court erred in refusing to apply the per

se rule to the charged agreement to allocate new, rather than existing, customers. A134-A135. Indeed, the *Hammes* court condemned as per se unlawful an agreement to allocate new customers, 33 F.3d at 782, and the *Flom* court held per se unlawful an agreement to allocate future construction contracts, 558 F.2d at 1182-83. *Cf. United States v. Consol. Laundries Corp.*, 291 F.2d 563, 575 (2d Cir. 1961) (reasoning that an "agreement to suppress all competition as to one phase of [a defendant's] business, i.e. old customers, should be *per se* illegal irrespective of their competition for new customers"). New customers are no less entitled to the benefits of competition, and the harm to competition is no less manifest in an allocation of new customers. Instead, in some cases, the only effective means to eliminate competition through customer allocation is to allocate new customers.

Likewise, the fact that defendants' allocation agreement was not based on geography does not make the per se rule inapplicable. As the Fifth Circuit explained in *United States v. Cadillac Overall Supply Co.*, that is "a distinction without substance." 568 F.2d 1078, 1088 (5th Cir. 1978). Customer allocation agreements "hamper[] the free choice of the consumer of the parties with whom the consumer would transact

34

business, and provide[] no incentive to achieve maximum efficiency on an industry wide basis." *Id.* at 1089.  That is true regardless of the basis on which the customers are allocated.

Moreover, territorial allocation of customers would make little sense in this industry.  Firms search for estates nationwide, and there is frequently no competition because only one firm identifies the potential heir.  Whether the defendants would face competition for any particular heir thus has nothing to do with geography.  Defendants needed to eliminate competition only when it existed, and that is what their conspiracy accomplished, allocating heirs just when those heirs should have had the benefit of competition.  *See* A17-A20.

2.  The district court erroneously thought the per se rule could not apply to an allocation agreement that "affected a small number of estates."  A135; *but see* A142 (noting "269 allegedly affected estates").  The applicability of the per se rule does not depend on the number of victims of the challenged restraint.  This Court has repeatedly applied the per se rule to conduct that harms only a single purchaser or is local in nature.  *See, e.g.*, *Reicher*, 983 F.2d 168 (holding per se unlawful a conspiracy to rig bids for a single contract); *United States v. Metro.*

*Enters., Inc.*, 728 F.2d 444 (10th Cir. 1984) (affirming conviction for conspiracy to rig bids to repave portions of a highway in Oklahoma). And while customer allocation agreements often harm many customers, there is no exception to the per se rule for agreements that are of a "limited nature." *United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367, 1371-72 (6th Cir. 1988) (per curiam).

3.  The district court was also wrong to conclude that the per se rule cannot apply because, in the district court's view, heir location services is a "relatively obscure industry." A135.  The Supreme Court has long held that "the Sherman Act . . . establishes one uniform rule applicable to all industries alike," *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940), and rejected "the argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation," *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351 (1982).  The district court's reasoning "ignores the rationale for *per se* rules, which in part is to avoid 'the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been

36

unreasonable—an inquiry so often wholly fruitless when undertaken.'"
*Maricopa*, 457 U.S. at 351 (quoting *N. Pac. Ry. Co. v. United States*, 356
U.S. 1, 5 (1958)).

In any event, the unusual aspect of the heir location business
defendants asserted below—i.e., the upfront outlay of resources for a
product only saleable to one or a handful of potential customers, A173—
is not unique to this industry. Many businesses, for example real estate
development, can require a substantial outlay of resources to prepare a
bespoke proposal or bid to compete for a particular project or contract
that cannot be reused for other projects or contracts.[12] Yet, "[w]hatever
may be [an industry's] peculiar problems and characteristics," *Socony-
Vacuum Oil Co.*, 310 U.S. at 222, the per se rule nonetheless applies if
competitors agree with each other to allocate customers.

---

[12] *See, e.g.*, Jonathan O'Connell et al., *Halt to the Search for New
FBI Building Prompts Frustration*, Wash. Post, July 11, 2017, at A11
(reporting that "[r]eal estate developers who devoted more than two
years to their proposals and spent millions of dollars designing and
planning a new [FBI headquarters] threw up their hands" when
officials cancelled plans to build a new headquarters; an estimated
"$50 million had been spent by local companies and jurisdictions on the
now-dashed project"; one potential developer spent "$8 million on its
plans").

### C. The District Court Erred in Holding that the Per Se Rule Could Not Apply Based on Its Conclusion that the Agreement Has the "Potential for Increased Efficiency"

Lastly, the district court erred in refusing to apply the per se rule because, in the court's view, defendants' customer allocation agreement "contained efficiency-enhancing potential." A135. Claimed efficiencies cannot be used to justify a per se unlawful agreement, and in any event, none exist here. And to the extent the district court concluded that the charged agreement was ancillary to a productive joint venture, that conclusion is factually baseless and legally unjustified.

1. The district court's reasoning "indicates a misunderstanding of the *per se* concept." *Maricopa*, 457 U.S. at 351. The per se rule adopts a "categorical judgment[] with respect to certain business practices that have proved to be predominantly anticompetitive." *Nw. Wholesale Stationers, Inc.*, 472 U.S. at 289. Thus, when a restraint is within a category deemed per se unlawful, "no offsetting economic or efficiency justifications" can "salvag[e]" it. *SCFC*, 36 F.3d at 963. The rule "eliminates the need to study the reasonableness of an individual restraint" and thereby gives "clear guidance for certain conduct." *Leegin*, 551 U.S. at 886; *see also Maricopa*, 457 U.S. at 344 (explaining

38

that the Supreme Court adopted per se rules for "the sake of business certainty and litigation efficiency" by making clear that certain "kind[s] of restraint[s]" are categorically illegal).

Thus, defendants' claimed efficiencies cannot justify departure from the per se rule. "The per se rule would collapse if every claim of economies from restricting competition, however implausible, could be used to move a horizontal agreement not to compete from the per se to the Rule of Reason category." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 595 (7th Cir. 1984). While it is doubtful that this, or any other, per se unlawful agreement among competitors would pass muster under the rule of reason, *see United States v. U.S. Gypsum Co.*, 438 U.S. 422, 476 (1978) (Stevens, J., concurring in part and dissenting in part), the per se rule prohibits courts from searching for such an agreement if it did exist. *See Catalano*, 446 U.S. at 649 ("[T]he fact that a practice may turn out to be harmless in a particular set of circumstances will not prevent its being declared unlawful *per se*.").

In any event, the "age-old cry of ruinous competition" is no defense, *Socony-Vacuum*, 310 U.S. at 221, and what defendants

mistakenly label "efficiencies" are nothing more than the avoidance of competition, *see* A183.  For example, defendants claim that when two firms faced competition for a single estate, one firm could—absent the agreement—disclose enough information for the heir to circumvent both firms and work directly with the administrator for the estate without paying either conspirator.  A182-A183.  Defendants argue their agreement is "output-increasing" because it avoids this scenario.  *Id.*  But output is not increased; only the conspirators' revenue.  If the conspirators just gave away the fruits of their efforts, the heir would still collect, retaining any legal or other services he or she needed to collect.

Similarly, defendants wrongly contend that their agreement has a "significant pro-competitive effect" because without it they would be forced to compete, would secure lower profits, and thus would be unable to research lower-value estates.  A183-A184.  But the Supreme Court has long held that "[t]he elimination of so-called competitive evils is no legal justification" for per se illegal conduct.  *Socony-Vacuum*, 310 U.S. at 220.  The Sherman Act rests on "[t]he assumption that competition is the best method of allocating resources in a free market[, which]

40

recognizes that all elements of a bargain . . . are favorably affected by the free opportunity to select among alternative offers." *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 695 (1978).  This "statutory policy precludes inquiry into the question whether competition is good or bad." *Id.* at 695.  Defendants' claims of efficiency ultimately boil down to concerns that competition will drive down their contingency fees.  But low prices benefit consumers, and any "loss of profits to . . . competitors" that "result[s] only from continued competition" is "not of concern under the antitrust laws." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 115 (1986).

2.  The district court mistakenly relied on *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 187-90 (7th Cir. 1985), in support of its claim that the "potential for increased efficiency supports application of the rule of reason instead of the *per se* standard."  A135.  *Polk Brothers* involves application of the ancillary restraints doctrine, in which an otherwise per se unlawful agreement that is ancillary to a legitimate joint venture is analyzed under the rule of reason.  That doctrine has no application here because the indictment charges a standalone customer allocation agreement.

41

In *Polk Brothers*, a retailer of appliances and home furnishings and a retailer of building materials and lumber agreed to build a single building and parking lot for their two stores. 776 F.2d at 187. In connection with their agreement to build and maintain the facility jointly, the two retailers agreed not compete in each other's core product lines. *Id.* The Seventh Circuit held that because the agreement not to compete was "an integral part" of productive cooperation to build the stores—the parties would not have cooperated without protection from competition from each other—the agreement should be evaluated under the rule of reason. *Id.* at 190. In doing so, the court distinguished such "ancillary" restraints that are "part of a larger endeavor whose success they promote," from "naked" restraints that do "nothing but suppress competition." *Id.* at 188-89. *See also Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986) (Bork, J.) (A customer allocation agreement is ancillary only if it is "subordinate and collateral to a separate, legitimate transaction" and reasonably necessary to make that separate transaction "more effective [or efficient] in accomplishing its purpose.").

42

The district court did not identify any legitimate collaboration to which the charged allocation agreement could have been ancillary, and defendants' claim below that their allocation agreement enabled them to work together and "limit the expenditure of resources," A182, is not credible; nor is it found in the indictment's factual allegations.  Most of the resources to identify and evaluate estates and to locate the heirs are spent before defendants and their co-conspirators contact the heirs, before they know they will be in competition with each other, and before the customer is allocated under the agreement.  To the extent that defendants want to pool resources with their competitors to administer the estates after the heirs are signed, that can be done without eliminating competition.

That is not to say that the defendants did not coordinate their efforts in any way.  By definition, any conspiracy to eliminate competition will involve sufficient coordination between competitors to carry out the conspiracy.  For example, in this case, the competitors needed to work together to develop a method for dividing the spoils of their conspiracy and then again when carrying out that portion of the agreement.  A19.  But parties to a per se unlawful conspiracy cannot

43

avoid the per se rule by styling their conspiracy as a joint venture if the purpose and effect of that venture is to eliminate competition.[13]  *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598 (1951) ("Nor do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a 'joint venture.'  Perhaps every agreement and combination to restrain trade could be so labeled."), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 336 (2d Cir. 2008) (Sotomayor, J., concurring).

More fundamentally, the indictment does not charge an allocation agreement ancillary to some productive joint venture.  Instead, the indictment charges a naked agreement to "suppress and eliminate

---

**13** Relatedly, *In re Sulfuric Acid Antitrust Litigation*, 703 F.3d 1004, 1013 (7th Cir. 2012), provides no basis for the district court's departure from the per se rule, A135.  That case involved a claim of price fixing lodged against a "legitimate" joint venture that "enabled substantial economies in transportation and marketing" and led to price decreases for customers.  703 F.3d at 1011-13.  The indictment contains nothing to suggest that there was a legitimate joint venture.

competition by agreeing to allocate customers of Heir Location Services sold in the United States."  A18.  At trial, the jury will be asked to decide whether the evidence proves beyond a reasonable doubt that the charged agreement existed and that defendants knowingly joined it.  If the jury finds instead that the evidence proves something else—e.g., an agreement to engage in a legitimate joint venture to which the assignment of heirs was subordinate and collateral—then the jury must acquit because that is not the conspiracy charged in the indictment.  *Cf. United States v. Green*, 592 F.3d 1057, 1068-69 (9th Cir. 2010) (affirming conviction under per se rule because evidence "was sufficient to support the jury's finding that [defendant] engaged in bid rigging," rather than merely organizing "legitimate teaming agreements" as defendant claimed).

Whether the evidence will prove the charged conspiracy goes to the ultimate merits.  The district court may not supply its own answer to that question in response to a pre-trial motion.  As this Court explained in *United States v. Pope*, Rule 12 does not permit a district court to decide in advance of trial questions that are relevant to guilt or innocence.  613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.) (citing

45

Fed. R. Crim. P. 12(b)(2)).  Pre-trial decisions going to the ultimate

merits "disserve[] judicial economy" and "risk trespassing on territory

reserved to the jury as the ultimate finder of fact." *Id.*  That risk is

particularly acute where a pre-trial ruling is based on evidence outside

the indictment. *Id.*  Here, defendants in their motion made claims

based on their "ongoing" data analysis and the documents submitted

under seal purportedly showing the "efficiency-enhancing" potential of

their customer allocation agreement.  A163, A183-A186, A213-A217 &

A226-A229, A260.  To be sure, the district court stated that it "would

reach the same result based solely on the conduct as it is described in

the indictment,"[14] A135, but the district court tellingly did not cite the

indictment in support of its conclusion.  In any event, the assertion is

---

[14] The district court wrongly claimed that the government "never
disputed" that the court could consider the written agreement attached
to the defendants' motion.  A135.  The government disputed the
consideration of factual material at every turn: in its opposition to the
original motion, A239 & A250, at oral argument, A56-A57 ("The
government objects to any consideration of factual material outside of
the indictment at this phase . . . including the guidelines agreement."),
and in its reconsideration motion, A97-A98.  In any event, nothing in
the written agreement indicates joint productive activity akin to the
"larger endeavor" in *Polk Brothers*, let alone that the customer
allocation was necessary to such an endeavor.

belied by the indictment, which contains no statements supporting the

district court's conclusion.

In sum, the indictment charges that defendants conspired to

eliminate competition by allocating customers—conduct that this Court

and the Supreme Court have held is per se unlawful.  The government

should be permitted to proceed to trial on that charge.

### D. Section 3731 Provides Jurisdiction to Review the Rule of Reason Order, and If It Does Not, this Court Should Issue a Writ of Mandamus Correcting the Order's Profound Departure from Governing Law

#### 1. The District Court's Rule of Reason Order Is an Effective Dismissal Appealable Under Section 3731

This Court has appellate jurisdiction over the Rule of Reason

Order under 18 U.S.C. § 3731 because that Order effectively dismissed

the indictment.  In relevant part, Section 3731 authorizes the

government in a criminal case to appeal "a decision, judgment, or order

of a district court dismissing an indictment . . . as to any one or more

counts, or any part thereof" except "where the double jeopardy clause of

the United States Constitution prohibits further prosecution."  *Id*.

Congress specified that this provision "shall be liberally construed to

effectuate its purposes," *id.*, and the Supreme Court has repeatedly said

47

that Section 3731 reflects Congress's intent "to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit." *United States v. Wilson*, 420 U.S. 332, 337 (1975); *see United States v. Scott*, 437 U.S. 82, 84-87 (1978); *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 568 (1977). Thus, "government appeals are not restricted to the specific categories set forth in 18 U.S.C. § 3731." *United States v. Prescon Corp.*, 695 F.2d 1236, 1241 (10th Cir. 1982).

This Court has recognized that an order is appealable under Section 3731 if it is "tantamount to" a dismissal of an indictment or one or more counts, even if it does "not formally 'dismiss' an indictment or happen to be labeled that way." *United States v. Bergman*, 746 F.3d 1128, 1131 (10th Cir. 2014); *see also United States v. Williams*, 449 F.3d 635, 643 (5th Cir. 2006) (explaining that a "district court judge cannot circumvent the government's right to appeal under § 3731 by taking action that has the effect of a dismissal yet never actually entering a 'decision, judgment, or order.'"). Under this test, jurisdiction is assessed by "examin[ing] the consequences of the ruling by the district court, unbounded by the label given it." *Id.*

The government brought this case solely under the per se rule.[15]
In this case (and all Sherman Act cases for the past several decades),
the government has exercised its prosecutorial discretion to limit
criminal antitrust prosecutions to conduct that clearly violates the per
se rule.[16]  This sound policy exists to provide "clear, predictable
boundaries for business" and businesspeople between conduct that is
potentially subject to the severe sanctions that accompany criminal
conviction and conduct that is subject only to civil equitable relief.[17]

There can be no dispute that a plaintiff can bring a Sherman Act
case under the per se rule and elect not to pursue a claim under the rule
of reason.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317
(3d Cir. 2010).  And the decision of "what charge to file or bring before a

---

[15] The government disavowed any rule of reason theory before the
district court.  A249 (informing the district court that the government
has "long eschewed prosecuting conduct subject to the rule of reason,
and it has no interest in doing so here").

[16] U.S. Dep't of Justice, Antitrust Div., Antitrust Division Manual, at
III-12 (5th ed. 2017), *available at* https://www.justice.gov/atr/file/
761166/download.

[17] Thomas O. Barnett, Assistant Attorney Gen., Antitrust Div., U.S.
Dep't of Justice, Criminal Enforcement of Antitrust Laws: The U.S.
Model (Sept. 25, 2006), *available at* https://www.justice.gov/atr/
speech/criminal-enforcement-antitrust-laws-us-model.

grand jury, generally rests entirely in [the prosecutor's] discretion."
*United States v. Armstrong*, 517 U.S. 456, 464 (1996).  Thus, the clear
and immediate consequence of the district court's decision to bar the
government from proceeding on a per se theory is that the indictment is
effectively dismissed (not, as the district court thought, that the
government must instead proceed under a previously disavowed
theory).  *Cf. Ins. Brokerage Antitrust Litig.*, 618 F.3d at 317 (noting that
where plaintiff pleads conduct not governed by the rule of reason and
fails to plead facts necessary to state a claim under the rule of reason,
the claim will be dismissed); *Polk Bros.*, 776 F.2d at 191.

Even if the government could or would proceed on a rule of reason
theory, the per se rule provides a discrete theory of liability, and a pre-
trial order that precludes the government from arguing a discrete
theory of liability is tantamount to a dismissal, thus making it
appealable under Section 3731.  *See United States v. Bloom*, 149 F.3d
649, 654 (7th Cir. 1998), *abrogated on other grounds*, *Skilling v. United
States*, 561 U.S. 358 (2010);[18] *see also United States v. Levasseur*, 846

---

[18] In *United States v. Bloom*, the government charged a single
fraudulent scheme to deprive the victim city of "revenues" and "honest
services."  149 F.3d at 651.  When the district court dismissed the count

F.2d 786, 790 (1st Cir. 1988); *United States v. Oakar*, 111 F.3d 146, 150 (D.C. Cir. 1997).

The fact that the district court did not "formally 'dismiss'" the indictment does not render its order any less of a dismissal under Section 3731. *Bergman*, 746 F.3d at 1131; *Williams*, 449 F.3d at 643. When its clear implication is understood, it is apparent the Rule of Reason Order dismissed the indictment in its entirety, and the district court simply failed to recognize the consequence of its decision. *Bergman*, 746 F.3d at 1131. At a minimum, the Rule of Reason Order dismissed a discrete theory of liability, and such a decision is appealable under Section 3731, as well. *Levasseur*, 846 F.2d at 790; *Bloom*, 149 F.3d at 653-54.

---

to the extent it was based on deprivation of honest services, the Seventh Circuit took jurisdiction over the appeal, because the honest-services theory provided a "discrete basis for the imposition of criminal liability." *Id.* at 654. Like the order in *Bloom*, the district court's Rule of Reason Order bars the government from proceeding on a "discrete basis for liability."

## 2.  Alternatively, the All Writs Act Provides this Court Authority to Issue a Writ of Mandamus Correcting the Lower Court's Departure from Well-Established Law

If this Court concludes that Section 3731 does not provide appellate jurisdiction over the Rule of Reason Order, the United States respectfully requests that the Court construe the pertinent parts of this brief as a petition for a writ of mandamus and issue the writ under the authority provided by the All Writs Act, 28 U.S.C. § 1651.[19]  The writ should direct the district court to recognize that the charged customer allocation agreement, if proved at trial, is subject to the per se rule, and

---

[19] In relevant part, Section 1651(a) provides that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  Concurrent with the filing of this brief in this Court, the government is providing a copy to the district court in compliance with Fed. R. App. P. 21(a)(1).  Courts of appeals routinely entertain requests to construe opening briefs as mandamus petitions in the event that Section 3731 does not provide jurisdiction for appeal. *See, e.g.*, *United States v. Farnsworth*, 456 F.3d 394, 396 (3d Cir. 2006); *United States v. Cote*, 51 F.3d 178, 180-81 & n.1 (9th Cir. 1995); *In re United States*, 900 F.2d 800, 802-03 (5th Cir. 1990); *United States v. Kane*, 646 F.2d 4, 5 (1st Cir. 1981); *United States v. Hetrick*, 644 F.2d 752 (9th Cir. 1980); *see also, e.g.*, Brief for Appellant United States of America, *United States v. Farnsworth*, 456 F.3d 394 (No. 06-1425), 2006 WL 6221237 (raising Section 3731 jurisdiction and mandamus together as alternatives in the opening brief); Brief for the United States at 6-11, *United States v. Cote*, 51 F.3d 178 (No. 93-30411), 1994 WL 16122500, at *6-11 (same).

further direct the district court to conduct all future proceedings
consistent with that understanding.  The issue is so fundamental, the
error so glaring, and the opportunity for review so elusive that an
uncommon remedy is, under these circumstances, both warranted and
necessary.

To be sure, a writ of mandamus "is to be invoked only in
extraordinary circumstances," *In re Cooper Tire & Rubber Co.*, 568 F.3d
1180, 1186 (10th Cir. 2009), such as "'when the trial court has so clearly
and indisputably abused its discretion as to compel prompt intervention
by the appellate court,'" *In re United States*, 397 F.3d 274, 282 (5th Cir.
2005) (per curiam) (quoting *In re Dresser Indus., Inc.*, 972 F.2d 540, 543
(5th Cir. 1992)).[20]  The Supreme Court has identified three criteria for

---

[20] The Court in *United States v. McVeigh* concluded that Section
3731 did not authorize an appeal from a pre-trial witness sequestration
order and declined to exercise its mandamus authority, observing that
it "may not be used to circumvent the policies effectuated by the
restrictive provisions of § 3731."  106 F.3d 325, 333 (10th Cir. 1997) (per
curiam).  The Court, however, repeatedly emphasized in *McVeigh* that
it did not "categorically rule out the possibility of mandamus relief"
even in the context of "procedural orders."  *Id.* at 328, 333.  And, in fact,
the Court has cited *McVeigh* in support of granting mandamus directed
at a substantive ruling in circumstances like those here.  *See infra* pp.
54.

issuing the writ: 1) "the party seeking issuance of the writ [has] no other adequate means to attain the relief he desires"; 2) the petitioner's "right to issuance of the writ is clear and indisputable"; and 3) "the issuing court, in the exercise of its discretion," is "satisfied that the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004). All are met here.

First, if the Court concludes that Section 3731 does not apply, the United States has no other means to obtain relief. The order will "significantly influence how the case is tried" by expanding the government's burden beyond what the law requires, permitting evidence and argument on defenses the law forbids, and instructing the jury on a rule that does not apply. *In re United States*, 578 F.3d 1195, 1199 (10th Cir. 2009) (unpublished).[21] And yet, if Section 3731 is inapplicable, the government has no avenue of relief other than mandamus. *Id.* (citing *McVeigh*, 106 F.3d at 330; *United States v.*

---

[21] This Court's order granting a writ of mandamus in *In re United States* was unpublished, but it nevertheless appears in the Federal Reporter as an appendix to an opinion dissenting from it. For the Court's convenience, this brief cites the order as it appears in the Federal Reporter.

*Wexler*, 31 F.3d 117, 128 (3d Cir. 1994); *In re United States*, 397 F.3d 274 (5th Cir. 2005)).  The government sought reconsideration in the district court, but reconsideration was denied.  *See Wexler*, 31 F.3d at 128.  If the defendant were acquitted under the rule of reason, the Double Jeopardy Clause would bar a government appeal; and if the defendant were found guilty under the rule of reason, the government would have no basis for appeal.  *See In re United States*, 578 F.3d at 1199; *In re United States*, 397 F.3d at 283.  Moreover, the ruling will effectively foreclose any trial whatsoever.  The government has already renounced any intention of trying the case under a rule of reason theory, so the district court's ruling is the case's practical terminus.  Thus, if Section 3731 does not apply, mandamus is the only route to correcting a grave error about the law governing this case.

Second, there is a "clear and indisputable" reason for this Court to intervene because the district court's Rule of Reason Order transparently contravenes multiple binding and longstanding precedents from this Circuit and the Supreme Court, *see supra* Part III.  *See United States v. Higdon*, 638 F.3d 233, 245-47 (3d Cir. 2011) (issuing the writ because the lower "court's insistence on giving an

55

improper jury charge constitutes 'clear and indisputable' error")

(quoting *Cheney*, 542 U.S. at 381). Disregarding controlling precedents

and invading the prerogatives of the prosecution by choosing the theory

of the case for them is why the order "represents [not just] clear legal

error [but] also . . . a clear abuse of discretion." *In re United States*, 397

F.3d at 285.

Third, issuing the writ is appropriate to prevent the district court

from adjudicating this criminal case based on a fundamental and clear

misunderstanding of governing law. *See In re United States*, 578 F.3d

at 1199-200 (issuing writ to prevent jury instruction on an

impermissible defense); *United States v. Higdon*, 638 F.3d at 245-47

(issuing writ to ensure proper jury instruction on elements of an

offense); *Wexler*, 31 F.3d at 121, 128 (issuing writ correcting erroneous

jury instruction on "genuine indebtedness" which government claimed

made certain criminal tax cases more difficult to prosecute and

rendered it unable to proceed to trial).

As the court in *Wexler* explained, "the adoption of a clearly

erroneous jury instruction that entails a high probability of failure of a

prosecution—a failure the government could not then seek to remedy by

56

appeal or otherwise—constitutes the kind of extraordinary situation in which we are empowered to issue the writ of mandamus."  31 F.3d at 128.  Here, not only is the entire architecture of the jury charge at issue, but so are innumerable evidentiary and other considerations that would not only significantly impact a trial, but also would likely scuttle the entire prosecution.

Accordingly, if Section 3731 does not provide jurisdiction for this appeal, then it is entirely appropriate, indeed essential, for this Court to use its mandamus authority to remedy this extraordinary situation and permit this case to proceed under the clear and controlling law of this Court and the Supreme Court.

## CONCLUSION

This Court should reverse the order that the indictment is barred by the statute of limitations; reverse the order that the case is subject to the rule of reason or, alternatively, issue a writ of mandamus directing the district court to apply the per se rule; and remand for trial.

## STATEMENT REGARDING ORAL ARGUMENT

This case presents issues that could have significant implications for the criminal enforcement of federal antitrust law, and oral argument would materially assist the Court in resolving those issues.  For these reasons, the government respectfully requests oral argument in this case.

Respectfully submitted.                    s/ Jonathan Lasken

                                         MAKAN DELRAHIM
                                           *Assistant Attorney General*

                                         ANDREW C. FINCH
                                           *Principal Deputy Assistant Attorney General*

                                         MARVIN N. PRICE, JR.
                                         *Acting Deputy Assistant Attorney General*

| | |
|---|---|
| KALINA M. TULLEY | KRISTEN C. LIMARZI |
| ROBERT M. JACOBS | JAMES J. FREDRICKS |
| RUBEN MARTINEZ, JR. | ADAM D. CHANDLER |
| MOLLY A. KELLEY | JONATHAN H. LASKEN |
| *Attorneys* | *Attorneys* |
| | |
| U.S. Department of Justice | U.S. Department of Justice |
| Antitrust Division | Antitrust Division |
| | 950 Pennsylvania Avenue, NW |
| | Room 3224 |
| | Washington, DC 20530-0001 |
| | 202-353-6638 |

January 3, 2018

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,822 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2013 with 14-point New Century Schoolbook font.

January 3, 2018                                      s/ Jonathan Lasken
                                                    _____
                                                    *Attorney for the*
                                                    *United States of America*

60

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made;

(2) that the ECF submission is an exact copy of the hard copies of this document that are to be filed with the court;

(3) the digital submission has been scanned for viruses with Symantec Endpoint Protection Version 12.1.6 build 7004 (12.1.7004.6500) with current protection definitions, dated January 2, 2018 r19, and according to the program is free of viruses.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

January 3, 2018                              s/ Jonathan Lasken
                                             *Attorney for the*
                                             *United States of America*

61

## CERTIFICATE OF SERVICE

I, Jonathan Lasken, hereby certify that on January 3, 2018, I

electronically filed the foregoing Opening Brief for the United States of

America (Corrected) with the Clerk of the Court of the United States

Court of Appeals for the Tenth Circuit by using the CM/ECF System.

I certify that all participants in the case are registered CM/ECF

users and that service will be accomplished by the CM/ECF system.

January 3, 2018                              s/ Jonathan Lasken
                                             *Attorney for the*
                                             *United States of America*

62

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/18 PageID.1016 Page 75 of 140
Case 2:16-cr-00403-DS Document 96 Filed 08/28/17 Page 1 of 4
Appellate Case: 17-4148    Document: 01019924687    Date Filed: 01/03/2018    Page: 1

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KEMP & ASSOCIATES, INC. AND<br>DANIEL J. MANNIX<br><br>Defendants. | Case No. 2:16-cr-00403-DS<br><br>ORDER ON DEFENSE MOTION<br>REGARDING APPLICATION OF RULE<br>OF REASON<br><br>U.S. District Court Judge David Sam<br>Magistrate Judge Brooke C. Wells |

WHEREAS, on August 17, 2016, the defendants were charged by way of Indictment with one count of violating the Sherman Act, 15 U.S.C. § 1;

WHEREAS, the defendants moved on March 31, 2017 for an order that this case be subject to the rule of reason for purposes of assessing the legality of the charged conduct under the Sherman Act;[1]

WHEREAS, the government submitted its opposition to the motion on April 28, 2017;

WHEREAS, the defendants submitted their reply on May 12, 2017;

WHEREAS, the Court heard oral argument on the motion on June 21, 2017, at the conclusion of which the Court ruled orally this case is subject to the rule of reason,

The Court hereby makings the following findings:

1.    In Sherman Act cases, the rule of reason presumptively applies. *See Texaco Inc. v.*

---

[1] The defendants' motion further requested an order that the Indictment be dismissed because a rule of reason prosecution does not meet constitutional vagueness standards or, in the alternative, because the statute of limitations bars this prosecution. The Court has not yet ruled on those issues, and they are not addressed in this Order.

*Dagher*, 547 U.S. 1, 5 (2006). *Per se* liability applies only where the practice fits a *per* se

category established by prior precedent, or on its face appears to be one that would always

restrict competition and decrease output. *See Cayman Exploration Corp. v. Utd. Gas Pipe Line

Co.*, 873 F.2d 1357, 1360 (10th Cir. 1989); *see also Dagher*, 547 U.S. at 5. "The *per se* rule's

conclusive presumption that the restraint is unreasonable should not be applied to a challenged

practice until 'experience with a particular kind of restraint enables the Court to predict with

confidence that the rule of reason will condemn it.'" *Cayman Exploration*, 873 F.2d at 1360

(*quoting Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 344 (1982)).

2.    In the Indictment, the government characterizes the defendants' conduct as

customer allocation, Dkt. 1 ¶¶ 9-10, which has previously been recognized in certain

circumstances as a *per se* violation, including by the Tenth Circuit, *see United States v. Suntar

Roofing, Inc.*, 897 F.2d 469, 472 (10th Cir. 1990). The Court may not rely on labels applied by

the government, however, and must instead analyze the substance of the allegations to determine

whether the challenged conduct constitutes customer allocation in a form that has been treated by

the courts as a *per se* violation. *See Cayman Exploration*, 873 F.2d at 1360; *see also Procaps

S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1083-84 (11th Cir. 2016); *In re Wholesale Grocery Prods.

Antitrust Litig.*, 752 F.3d 728 (8th Cir. 2014); *In re Sulfuric Acid*, 703 F.2d 1004 (7th Cir. 2012);

*California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1137 (9th Cir. 2011) (en banc); *Polk

Bros. Inc. v. Forest City Enters.*, 776 F.2d 185, 187-90 (7th Cir. 1985).

3.    The main forms of customer allocation recognized by prior precedent are

geographic and existing-customer allocations. But the agreement charged in the Indictment (set

forth in a written agreement titled the "Guidelines")[2] does not resemble either of those, and in

_____

[2] The written agreement, called the "Guidelines," documenting the charged conduct was
submitted by the defendants' with their motion. The Court may properly consider that document

particular it does not resemble the existing-customer allocation at issue in *Suntar Roofing*. Among other things, the Guidelines were structured in an unusual way, affected a small number of estates, and occurred in a relatively obscure industry (heir location services) with an unusual manner of operation. The government has not identified, and the Court is not aware of, any case addressing the particular kind of restraint at issue here, or otherwise closely resembling this one. *See Cayman Exploration*, 873 F.2d at 1360; *Procaps*, 845 F.3d at 1084. The Court therefore cannot predict with any confidence, and does not believe, that the Guidelines operated as a classic customer allocation. *See In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 273 (6th Cir. 2014).

    4.    Indeed, unlike other customer allocations, the Guidelines on their face would not necessarily restrict competition or decrease output, but instead contained efficiency-enhancing potential. The Guidelines applied only where two firms had already invested significant resources investigating the same estate. The Guidelines provided for the firms to integrate their efforts going forward, specifically in administering the probate process of the estate, which needed to be done only once. The potential for increased efficiency supports application of the rule of reason instead of the *per se* standard. *See Sulfuric Acid*, 703 F.3d at 1013; *Polk Bros.*, 776 F.2d at 187-90.

---

at this stage because it forms the basis of the government's allegations, *see, e.g.*, *Borde v. Bd. of Comm'rs*, 514 F. App'x 795, 799 (10th Cir. 2013), and because the government never disputed as much, *see United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994); *United States v. Brown*, 925 F.2d 1301 (10th Cir. 1991). Nevertheless, the Court can and would reach the same result based solely on the conduct as it is described in the Indictment.

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/18 PageID.1019 Page 78 of 140
Case 2:16-cr-00403-DS Document 96 Filed 08/28/17 Page 4 of 4
Appellate Case: 17-4148    Document: 01019924687    Date Filed: 01/03/2018    Page: 4

Based on the foregoing findings, it is hereby ORDERED that this case is subject to the rule of reason for purposes of determining whether the conduct charged in the Indictment violates the Sherman Act.

Dated this 28th day of August, 2017.

BY THE COURT:

_____

Judge David Sam
United States District Court Judge

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/18 PageID.1020 Page 79 of 140
Case 2:16-cr-00403-DS Document 97 Filed 08/28/17 Page 1 of 9
Appellate Case: 17-4148    Document: 01019924688    Date Filed: 01/03/2018    Page: 1

THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.  2:16CR403 DS |
| | ) | |
| | ) | |
| vs. | ) | MEMORANDUM DECISION |
| | ) | AND ORDER |
| KEMP & ASSOCIATES, INC. AND | ) | |
| DANIEL J. MANNIX | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


# I.  INTRODUCTION


The Defendants in this case, Kemp & Associates, Inc. and its vice-president and part

owner Daniel J. Mannix, were indicted on August 17, 2016 on a single-count conspiracy to

violate the Sherman Act, 15 U.S.C. § 1, by engaging in customer allocation pursuant to a

detailed, written agreement that was not concealed and that terminated in 2008.  The agreement

at issue is a set of guidelines which governed the joint activity between Defendants and Blake

and Blake ("the Guidelines").  Defendants filed a Motion for Order that the Case be Subject to

the Rule of Reason and to Dismiss the Indictment on March 31, 2017. The parties appeared

before the Court on June 21, 2017 for oral arguments on Defendants' Motion for Order that the

Case be Subject to the Rule of Reason and to Dismiss the Indictment.  The Court found that the

rule of reason governs this case and directed the Defendants to file a proposed order in

accordance with the Court's ruling.  The Court did not rule on the statute of limitations issue.

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/18 PageID.1021 Page 80 of 140
Case 2:16-cr-00403-DS Document 97 Filed 08/28/17 Page 2 of 9
Appellate Case: 17-4148    Document: 01019924688    Date Filed: 01/03/2018    Page: 2

The defendants submitted a proposed order for the Court's signature on June 30, 2017.  The

government filed a Motion to Reconsider Oral Ruling, Objection to Defendants' Proposed Order

and Request for a Ruling On Defendants' Motion to Dismiss on July 14, 2017 alleging that the

Court's holding applying the rule of reason to the charged agreement is clear error.  Both parties

are also requesting that the Court rule on the statute of limitations issue which Defendants raised

in their Motion.

## II.  ANALYSIS

### A. Reconsideration

The government is requesting that the Court reconsider its ruling made after oral

argument on  June 21, 2017.  Because the government offers no facts or law which would

suggest to the court that its earlier decision was erroneous, the motion to reconsider is denied and

the Court affirms its ruling based on reasoning given at the hearing on June 21st and in its

ORDER ON DEFENSE MOTION REGARDING APPLICATION OF RULE OF REASON.

### B. Statute of Limitations

Both parties are requesting that the Court issue a ruling on the statute of limitations issue

raised in Defendants' Motion to Dismiss dated March 31, 2017.  Defendants are asking that the

Court dismiss the Indictment because it is time-barred.  Statutes of limitation provide protections

to a defendant's right to a fair trial as over time it becomes difficult or impossible for defendants

and prosecutors to present a complete and fair trial when evidence may become available or

recollections fail.  Additionally, limitations exist to ensure the government does not unreasonably

delay in bringing a case.

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/18 PageID.1022 Page 81 of 140
Case 2:16-cr-00403-DS Document 97 Filed 08/28/17 Page 3 of 6
Appellate Case: 17-4148    Document: 01019924688    Date Filed: 01/03/2018    Page: 3

"[T]he applicable statute of limitation…is…the primary guarantee against bringing overly stale criminal charges." *United States v. Marion,* 404 U.S. 307, 322 (1971) (citing *United States v. Ewell,* 383 U.S. 116, 122 (1966)). "Such statutes represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice; they 'are made for the repose of society and the protection of those who may (during the limitation) . . . have lost their means of defence.'" *Id.* (citing *Pub. Schs v. Walker*, 76 U.S. 282, 288 (1870)). Given the fundamental protections they provide, "criminal statutes of limitation are to be 'liberally interpreted in favor of repose.'" *United States v. Habig*, 390 U.S. 222, 227 (1968) (quoting *United States v. Scharton*, 285 U.S. 518, 522 (1932)).

The Indictment in this case alleges a single conspiracy to violate Section One of the Sherman Act in that the Defendants entered into a conspiracy with Richard A. Blake Jr. and others "to suppress and eliminate competition by agreeing to allocate customers of the Heir Location Services sold in the United States." Indictment ¶ 9. The Indictment makes plain that the conspiracy charged is the allocation of customers between two competitors, Kemp & Associates and Blake & Blake and states that "the substantial terms of [the conspiracy] were to allocate customers of Heir Location Services sold in the United States." Indictment ¶ 10.

The limitations period for a conspiracy to violate the antitrust laws is five years. 18 U.S.C. § 3282(a). The Guidelines agreement between Kemp & Associates and Blake and Blake ended in July 2008. After that time, no additional estates became subject to the Guidelines and there was no further allegedly wrongful allocation of customers. Thus, the alleged conduct in furtherance of the criminal purpose of the conspiracy ended more than eight years before the filing of the Indictment in this case.

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/18 PageID.1023 Page 82 of 140
Case 2:16-cr-00403-DS Document 97 Filed 08/28/17 Page 4 of 9
Appellate Case: 17-4148    Document: 01019924688    Date Filed: 01/03/2018    Page: 4

As to whether the statute of limitations bars prosecution in this case, "the crucial question . . . is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Grunewald v. United States*, 353 U.S. 391, 397 (1957).  The Court is bound by the language of the Indictment when determining the scope of the alleged conspiracy.  *See United States v. Qayyum*, 451 F.3d 1214, 1218-19 (10th Cir. 2006).  The scope of the alleged conspiracy as defined in the indictment is "to suppress and eliminate competition by agreeing to allocate customers of Heir Location Services sold in the United States."  It then follows that any conspiratorial agreement ceased to exist once the allocation of customers through the Guidelines ceased.  Once the firms agreed to end the Guidelines, only routine, administrative consequences of a concluded allocation agreement remained, and nothing more was done with respect to that estate that served the purpose of "suppressing" or "eliminating" competition between the two.

In regard to a conspiracy to violate the Sherman Act, it exists only for so long as its members continue to commit acts in furtherance of the agreement that tend to suppress or restrain competition.  *United States v. Inryco*, 642 F.2d 290, 293 (9th Cir. 1981) ("While a Sherman Act conspiracy is technically ripe when the agreement to restrain competition is formed, it remains actionable until its purpose has been achieved or abandoned and the statute of limitations does not run so long as the co-conspirators engage in overt acts designed to accomplish its objectives.").  Here, the purpose of the alleged conspiracy had been abandoned in July 2008 when the Guidelines were terminated and all that remained were administrative issues related to resolving the estates and payments resulting therefrom.

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/18 PageID.1024 Page 83 of 140
Case 2:16-cr-00403-DS Document 97 Filed 08/28/17 Page 5 of 9
Appellate Case: 17-4148    Document: 01019924688    Date Filed: 01/03/2018    Page: 5

The government argues that another object of the conspiracy was economic enrichment and that the receipt or distribution of any proceeds from the administration of estates that were subject to the Guidelines, represents conduct in furtherance of the conspiracy and makes the charge timely.  However, this theory confuses the results of a conspiracy with actual conduct in furtherance of it.  A conspiracy's statute of limitations should not be extended 'indefinitely beyond the period when the unique threats to society posed by a conspiracy are present." *United States v. Doherty*, 867 F.2d 47, 62 (1st Cir. 1989).  Here the "unique threat" identified in the indictment is the alleged customer allocation underlying the only charge in the case and that threat ended with the termination of the Guidelines in July 2008.  Therefore, this case can be distinguished from cases cited by the government such as *United States v. Morgan*, 748 F.3d 1024 (10th Cir. 2014) and *United States v. Evans & Associates Construction Co.*, 839 F.2d 656 (10th Cir. 1988).

In *Evans*, the "Sherman Act violation was 'accomplished both by the submission of noncompetititve bids and by the request for and receipt of payments at anti-competitive levels.'" *Id.* at 661. The *Morgan* case was a kidnapping and robbery case where the evidence showed that "the central purpose of [the] kidnapping and robbing [] was to obtain money and divide it among the co-conspirators," and statements regarding the distribution of proceeds "were made in the course of and in furtherance of the conspiracy."  748 F.3d at 1036-37. These cases are distinguishable in that the evidence in *Evans* and *Morgan* shows that the central purpose of the conspiracy was to obtain wrongful proceeds or money.

While the Indictment here mentions the payment of proceeds, Ind. ¶¶ 11 (h), (i), the central purpose of the conspiracy charged was not "economic enrichment."  Administering

Case 2:16-cr-00403-DS  Document 110-2  Filed 12/14/18  PageID.1025  Page 84 of 140
Case 2:16-cr-00403-DS  Document 97  Filed 08/28/17  Page 6 of 9
Appellate Case: 17-4148     Document: 01019924688     Date Filed: 01/03/2018     Page: 6

estates bore no relation to customer allocation - the threat claimed to be the purpose of the conspiracy. Additionally, the government has identified 269 allegedly affected estates, the administration of which consisted of a series of ordinary, non-criminal events that could last many years.  In contrast, *Evans* involved the bid for one contract which was bid, granted, completed and fully paid within the two years.  *See Evans*, 839 F.2d at 657, 660-61.

The alleged conspiracy here was to allocate heirs, and the Guidelines were terminated by Mannix in July 2008.  After termination of the Guidelines, certain administration work, including the recovery of monies for heirs and the payment of the firms themselves, continued into the five-year period prior to the Indictment.  Because of the length of time it may take to complete full administration of an estate, the theory that this extends the conspiracy into the statute of limitations period would create a significant arbitrariness regarding the length of the limitations period.  This period could change based on factors unique to each estate such as number of heirs, the jurisdiction of the estate, the speed the lawyers handle the matter, and others.  This arbitrariness is not consistent with the very reasons limitations periods exist in criminal cases. Therefore, this court finds that the conspiracy ended with the termination of the Guidelines in July 2008 and the case is dismissed.

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/18 PageID.1036 Page 85 of 140
Case 2:16-cr-00403-DS Document 97 Filed 08/28/17 Page 7 of 9
Appellate Case: 17-4148    Document: 01019924688    Date Filed: 01/03/2018    Page: 7

## III.  CONCLUSION

For the foregoing reasons Defendants Motion for Order that the Case be Subject to the

Rule of Reason and to Dismiss the Indictment is granted and the case is dismissed as barred by

the statute of limitations.


SO ORDERED.


DATED this ___28th___ day of ___August___, 20_17___.


BY THE COURT:


_____

DAVID SAM
SENIOR JUDGE
U.S. DISTRICT COURT

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/18 PageID.1027 Page 86 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/17 Page 1 of 95
Appellate Case: 17-4148   Document: 01019924689   Date Filed: 01/03/2018   Page: 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION


In re:                          )
                                )
UNITED STATES OF                )
AMERICA,                        )
                                )
        Plaintiff,              )
                                )
vs.                             )   Case No. 2:16-CR-403DS
                                )
KEMP & ASSOCIATES, INC.         )
AND DANIEL J. MANNIX,           )
                                )
        Defendants.             )
                                )
_____         )


BEFORE THE HONORABLE DAVID SAM

June 21, 2017


Motions Hearing


Laura W. Robinson, RPR, FCRR, CSR, CP
351 South West Temple
8.430 U.S. Courthouse
Salt Lake City, Utah 84101
(801)328-4800

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1282 Page 87 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/16 Page 2 of 95
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 2

**Appearances of Counsel:**

For the Plaintiff:        Molly Anne Kelley
                                  Kalina M. Tulley
                                  Robert Jacobs
                                  Ruben Martinez, Jr.
                                  Attorneys at Law
                                  US Department of Justice
                                  Antitrust Division
                                  209 S. LaSalle Street Suite 600
                                  Chicago, Illinois 60604

                                  Jacob J. Strain
                                  Attorney at Law
                                  U.S. Attorney's Office
                                  111 South Main Street
                                  Suite 1800
                                  Salt Lake City, Utah 84111

For Kemp & Associates:    James A. Mitchell
                                  Attorney at Law
                                  Ballard Spahr LLP
                                  919 Third Avenue
                                  New York, New York  10022

                                  Jason D. Boren
                                  Attorney at Law
                                  Ballard Spahr, LLP (UT)
                                  201 South Main Street
                                  Suite 800
                                  Salt Lake City, Utah 84111

                                  Michael J. Grudberg
                                  Attorney at Law
                                  Tarter Krinsky & Drogin LLP
                                  1350 Broadway
                                  New York, New York 10018

For Daniel J. Mannix:     Robert F. Albert
                                  Devin M. Cain
                                  Attorneys at Law
                                  Morvillo Abramowith Grand Iason
                                  & Anello PC
                                  565 Fifth Avenue
                                  New York, New York 10017

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.10293 Page 88 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/17 Page 3 of 95
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 3

 1              **Salt Lake City, Utah, June 21, 2017**

 2                        **(10:02 a.m.)**

 3          THE COURT:  Good morning counsel and others who are

 4     present for this hearing.  The court welcomes you here this

 5     morning.

 6          We are here to address case number 2:16-CR-403, *United*

 7     *States of America versus Kemp & Associates and others*.  And

 8     counsel, at counsel table, I believe the last time we had

 9     Ms. Tulley, is that right?

10          MS. TULLEY:  Yes, Your Honor.

11          THE COURT:  And you have with you -- who do you have

12     with you at counsel table?

13          MS. TULLEY:  Your Honor, this is Molly Kelley, she is

14     going to be arguing for the government, and also with me is

15     Robert Jacobs and Ruben Martinez.

16          THE COURT:  All right, very well.  Thank you, counsel.

17     And for the defendants, we have -- I think Jason Boren was

18     here last time.

19          MR. BOREN:  Good morning, Your Honor.  Yes, today we

20     have Richard Albert at counsel table along with Devin Cain.

21     We also have Mr. Mannix sitting at the front table.

22          THE COURT:  Yes.  Mr. Mannix, the court welcomes you

23     as well.

24          MR. BOREN:  At the back table we have counsel for Kemp

25     & Associates.  We have Jim Mitchell and Michael Grudberg.

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.10304 Page 89 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/07 Page 4 of 95
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 4

 1              MR. GRUDBERG:  Good morning, Judge.

 2              THE COURT:  All right, very well.  And Mr. Cain is

 3      going to be arguing; is that right?

 4              MR. ALBERT:  Your Honor, I'm, with the court's

 5      permission, I'm going to be arguing the Rule of Reason

 6      argument and with the court's permission Mr. Mitchell will

 7      be arguing the statute of limitations piece for the

 8      defendants.

 9              THE COURT:  All right, very well.  My notes do reflect

10      that we have one motion in abeyance and we have the motion

11      today to the Rule of Reason, whether the case is subject to

12      the Rule of Reason or the per se rule, right?

13              MR. ALBERT:  Yes, Your Honor.

14              THE COURT:  And this is the defendant's motion.  Do

15      you have an estimate, counsel?  I would like an estimate of

16      your time.

17              MR. ALBERT:  Um, Your Honor, I think my piece might go

18      around a half hour.  I think Mr. Mitchell's piece around --

19              MR. MITCHELL:  10 to 15 minutes, judge.

20              THE COURT:  So a total, a maximum 45 minutes; is that

21      correct?

22              MR. ALBERT:  Yes, Your Honor.  We would like to

23      reserve, obviously, some time to respond to whatever the

24      government has.

25              THE COURT:  For the government?

Case 2:16-cr-00403-RS Document 110-2 Filed 12/14/16 PageID 10315 Page 90 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/17 Page 5 of 95
Appellate Case: 17-4148   Document: 01019924689   Date Filed: 01/03/2018   Page: 5

1          MS. KELLEY:  Your Honor, I don't expect to exceed

2     15 minutes.

3          THE COURT:  All right, 15 minutes, very well.  All

4     right counsel, um, we will look forward to hearing your

5     argument.

6          MR. ALBERT:  Thank you, Your Honor.  Your Honor, um,

7     one of our central points is that just putting a label on a

8     particular conduct, customer allocation, that doesn't end

9     the discussion that starts the discussion.  Because the case

10    law in this area, and they're mostly civil cases, of course,

11    but it is the exact same statute, it's the Sherman Act and

12    it is the exact same case law doctrine.  The cases are

13    pretty much all about one party labeling certain conduct so

14    that it seems at first blush to fit into a per se box.  They

15    use the label price-fixing or customer allocation and market

16    allocation, and there are a multitude of cases, and we cite

17    a number of them in our papers, that shows what the court

18    must do then is look behind and make its own determination

19    as to whether the conduct actually fits in those very

20    narrowly defined per se category, or whether it falls under

21    the general rule of the Sherman Act the Rule of Reason.

22    There is a number of cases that we cite where the courts --

23    I mean essentially the cases are really all about looking

24    past the label and saying is it right or not.

25          The Tenth Circuit case, *Cayman Exploration Corp,* that

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1032 Page 91 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/07 Page 6 of 95
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 6

```
 1    is labeled price-fixing, customer allocation cases Page 17

 2    and 18 and 22 through 25 of our main brief.  There is the

 3    Wholesale Grocery Products case and the Eighth Circuit

 4    Sulfuric Acid, which we'll be talking about, Harris V

 5    Safeway, which is a Ninth Circuit en banc, Polk Brothers,

 6    another one from the Seventh Circuit that is particularly

 7    useful.  Procaps major which is a District of Columbia case.

 8    And what you see when you -- when you look at those cases

 9    and you study the area is that for customer allocation the

10    authorities and I would say the Areeda & Hovenkamp treatise

11    is also very helpful and cited regularly by the Supreme

12    Court, but the authorities recognize two classic case types

13    of customer allocations that have been held to fall into the

14    per se category.  Geographic allocation, where somebody says

15    I will take Kansas, you take Nebraska, and existing customer

16    allocations.  I have this customer, you know, I am servicing

17    these businesses, you're servicing those, don't raid mine.

18    Those are the -- those are the cases.  Those are the classic

19    cases that fit in the per se category.  This case is neither

20    of those and it's not even close.  It's an unusual

21    agreement, we refer to it as the guidelines because that's

22    actually the title on the document by which it was

23    documented that applied in very limited circumstances in an

24    unusual industry, heir location, and our main point is that

25    the court has to look past the label.  It's particularly
```

Case 2:16-cr-00403-DS  Document 110-2  Filed 12/14/16  PageID.1037  Page 92 of 140
Case 2:16-cr-00403-DS  Document 88  Filed 06/29/17  Page 7 of 95
Appellate Case: 17-4148   Document: 01019924689   Date Filed: 01/03/2018   Page: 7

1      something that is appropriate in a case like this where

2      there is a written agreement that you can actually look at

3      and you have to analyze it in the context of the market and

4      the industry at issue.  And it's striking because the

5      government in its papers, and maybe they will -- they will

6      straighten this up when they speak, but they are saying you

7      can't look at the agreement itself, you can't look past what

8      we say in the indictment, and why its design is

9      pro-efficiency and pro-competitive, and you can't look past

10     the label now, and you can't do it at trial because no

11     evidence regarding pro-efficiency aspects of the guidelines,

12     no evidence regarding why the guidelines were reasonable, is

13     admissible at trial.  That's on Page 11 of the government's

14     brief.  And that's really directly contrary to what the

15     decisions instruct in this area.  Now I must tell you if the

16     government's view on those points prevail and what we would

17     have in this case would be a document -- the government

18     would call one witness, a document custodian and ask is this

19     a copy of the guidelines agreement?  Yes, it is and it would

20     be admitted, and then the court would instruct the jury

21     that's a customer allocation agreement and we could all go

22     home and Kemp would be convicted and Mr. Mannix could go

23     directly to sentencing.  That's not fair, it's not just, and

24     it's not what the cases in this area teach as to how it is

25     -- how this process is supposed to work.  And the

1    government's argument on this is also striking because we

2    have put facts forward and our motion analysis shows that

3    not only is the pro-efficiency aspect of the guidelines

4    apparent from its design, and I'm going to speak to that

5    further in a few minutes, but, in fact, in the real world,

6    the pro-efficiency impact actually happened because the data

7    shows that Kemp was able to service a significantly greater

8    portion -- proportion of small estates during the guidelines

9    period and also that the guidelines had a de minimis, de

10   minimis impact on price.  And if we could have the charts,

11   please.

12        Your Honor, this is, once we get it up on the screen,

13   this is a chart that is in our papers in our main brief and

14   it shows the blue line is the state -- the government's --

15   the states the government has listed in stills particulars

16   as those impacted by the guidelines and the red line is all

17   other states serviced by Kemp during the period.  And if you

18   look at the chart, you can see that the difference is de

19   minimis and this is for the entire period or the period for

20   which we have data that -- that the guidelines was in place.

21   The difference is de minimis.  It is .65 percent, it's

22   negligible.  And if we could have the next slide, please, we

23   did it another way, um, where we looked at states -- that

24   the blue line is states where -- where Kemp & Associates had

25   -- where both Kemp and Blake & Blake operated, and the red

1    line is where Blake didn't operate but Kemp did.  So that's

2    a control group.  And, again, if you look at it, um, you see

3    that the difference in rates is negligible, it is .6 percent

4    in this case, and this one also shows when the end of the

5    agreement is in July of '08.  So if you could take that

6    down.

7         So, you know, preventing harmful price impact to

8    customers is really, really what the antitrust laws are all

9    about and assessing if an agreement helps productivity and

10   efficiency is also what the antitrust law is all about.  But

11   the government is claiming that the court can't look at that

12   and the jury can't look at that and that is striking.  And

13   Your Honor I just want to briefly speak a little bit about

14   the heir location industry.  We've laid it out in our papers

15   but I think it just worth walking through a little bit

16   because it is an unusual industry.

17        THE COURT:  Yes, I don't think there is many companies

18   that operate in this area, are there?

19        MR. ALBERT:  There are not.  There has been a handful

20   over time, it's a sort of mom and pop industry, um, a lot of

21   family run shops, um, originally started pretty local and

22   then they expanded over time.  But it's sort of a -- it's

23   sort of an unusual industry and obviously the business of

24   this -- of firms in this industry is to look for estates or

25   individuals who died intestate so the estates would

1    typically escheat to the state and then locate the rightful

2    heirs to those estates, if they can, through genealogical

3    research, and then help the heirs recover their share of the

4    estate in exchange for a percentage of the recovery most of

5    the time for these estates the heirs really had no awareness

6    of their relationships to the decedent so any money, any

7    inheritance they get is really, you know, your

8    quintessential found money.  And finding estates is labor

9    intensive.  I mean the way the business works is the field

10   reps are just driving from county courthouse to county

11   courthouse.  Of course now a days more records are

12   electronic, but at the time of this case that really was not

13   so much the case and it was just pounding the pavement.

14        Once the estate is located, there is a complicated

15   evaluation process, a little bit more art than science but

16   is the estate large enough to be able to solve -- to be able

17   -- large enough and likely enough to be able to be solved

18   that it justifies putting the resources in to do it.

19   Obstacles to recovery, there are many of them.  I mean one

20   of them is very basic.  But if you have somebody named

21   Smith, it is almost -- it's very difficult.  If you have a

22   very, very common surname, it can be very difficult to do

23   the -- to do the searching.  Um, and the difficulty of the

24   genealogical searching is actually what lead Kemp &

25   Associates to be here in Salt Lake City.  They moved here

```
 1     from Florida to take advantage of the Family History Library

 2     here in Salt Lake City.

 3          Obviously, the genealogical searching for the heirs is

 4     just part of it.  There is a lot of additional work then to

 5     track down the heirs, and then, um, and, of course, the work

 6     that's done, which is all done before you ever approach the

 7     heir, all of that work is customized to that one estate.

 8     It's not like there is value to it for anything other than

 9     that one estate.

10          And then once the estate is, they use the phrase

11     solved, the next phase is to approach the heirs and talk to

12     them about work, offer to help them in claiming the

13     inheritance in exchange for a percentage of the recovery.

14     If they agree they sign a contract assigning their rights to

15     Kemp or Blake and the company acts on their behalf in

16     claiming the inheritance.  And then after that is the final

17     phase and it is an important phase we call it the

18     administration phrase in our papers, sometimes referred to

19     as the legal phase because lawyers are involved where the

20     heir location firm engages counsel, prepares the factual

21     material underlying the court filings, and other material

22     that are needed for probate court, and then gets more

23     information from the heirs, provides information to the

24     heirs, and administers the distribution of the estate and

25     payment of counsel and any vendors.
```

```
 1              That last phase can go on for quite a while because

 2     some probate court move quite slowly and there is a lot of

 3     work.  There are people at Kemp whose pretty much sole job

 4     is to handle that last phase.

 5              Now, I would like to talk a little bit about the

 6     guidelines agreement itself.  Um, I've talked a lot about it

 7     but it's worth a little tighter analysis of its language.

 8     If I could have the slide on that, please.  Okay, so what

 9     this is -- both -- this is just highlighting some of the

10     language from the indictment and the guidelines.  These

11     materials are in the papers before Your Honor.  The

12     guidelines are Exhibit B to my declaration.  But -- so just

13     looking at the -- on the right, the guidelines, the first

14     paragraph, the very first sentence of the guideline says, if

15     company A contacts an unsigned heir that has been hit by

16     company B, then company A contacts company B and splits the

17     case.  That's kind of the main -- one of the main operative

18     aspects of the guidelines basically, but it points out how

19     narrow the guidelines are.  It's only in the unusual -- only

20     in the circumstance where both companies find themselves

21     having invested the significant resources to find the

22     estate, chase down the heirs, and then actually show up at

23     one of the heirs that they are in that situation where they

24     are duplicating each other's work.  That is the only time

25     that the guidelines can potentially kick in.  It's very
```

1    different from any of the other -- that narrow application

2    and being isolated to just situations where they're

3    duplicating efforts.  It is very different from the cases

4    that are cited in the papers.  And then there is that term

5    below that is highlighted in blue that says that the company

6    that was there first, which is company B, gets to keep the

7    full value of the assignments that are in their hand or are

8    dated prior to the date that company A calls.  And that --

9    that clause which is not mentioned in the indictment, is an

10   efficiency enhancing provision because -- because it

11   maintains the incentive for both firms to race to get the

12   best heirs first.  That's where the competition really

13   happens in racing to find -- doing the research and finding

14   heirs and if you already have some in hand, those are not

15   split.  So that is an efficiency enhancing part of the -- of

16   the guidelines.

17        Going to the next paragraph below, this just specifies

18   that the process does -- is only initiated when one company

19   contacts an unsigned heir that has been touched by the other

20   company.  And if that's not the situation, the contacted

21   company is under no obligation to discuss the case.  Again,

22   the guidelines only come in when there is proof that they're

23   working on that they've solved the same estate.  And in this

24   way, Your Honor, it's interesting but the guidelines are

25   just kind of a variance of another agreement that is very

Case 2:16-cr-00403-DS  Document 110-2  Filed 12/14/18  PageID.1040  Page 99 of 140
Case 2:16-cr-00403-DS  Document 69  Filed 06/29/17  Page 14 of 95
Appellate Case: 17-4148     Document: 01019924689     Date Filed: 01/03/2018     Page: 14

1    common in the heir location industry which is a

2    correspondent agreement where because the firms were

3    geographically diverse, sometimes in the old days, firms

4    would have more resources on the ground in a particular area

5    and they would find that oh, the heirs are located in

6    Florida, Kemp is in Florida, I'm in Seattle, and so we will,

7    you know, they will agree among themselves to split the

8    work, split -- and split the estate.

9        And that often happens when you have the mother side

10   on one -- in one location and the father side in the other.

11   This agreement, the guidelines agreement, is just a variant

12   on that correspondent coordination agreement which is very

13   much like what we see certainly in New York we see a lot two

14   plaintiff law firms coming together on the same case, um, a

15   big class action case and they get together and they agree

16   okay I will take this responsibility for discovery, you take

17   that responsibility for pretrial and they split the fees.

18   That is -- that is the -- and by the way, it is very public

19   that heir location firms do this correspondent type

20   relationship, it is even on the website of Blake & Blake.

21   So the guidelines were just sort of a variance of that

22   longstanding situation or way of organizing firms

23   coordinating that nobody I'm not aware of anybody claiming

24   was illegal or inappropriate.

25        If we could flip to the next slide, please.  So I'm

14

1    going, just to move along, I'm going to go to the second

2    paragraph which is paragraph four of the guidelines and,

3    again, this is one of the key operative paragraphs of the

4    guidelines.  It says the split should be 55/45 with the

5    attorney fees coming off the top.  The company that does the

6    signing and documenting gets the 55 percent share.  The

7    company that has more expenses and does more work gets paid

8    more.  This is a critical, you know, efficiency enhancing

9    aspect of the guidelines and -- and it's just laying right

10   out there that the companies doing more work should get paid

11   more.  And by the way, and when we speak about right in the

12   guidelines where it says the signing and documenting, the

13   signing and the documenting is what I call the

14   administrative phase.  It's the documenting of, you know, of

15   getting the paperwork from the heirs and getting that into

16   proper form for the probate court to -- to get paid out on

17   the will.  The guidelines are structured to encourage the

18   firm to do more work and get the bigger share of the fee.

19        Finally, in the third scenario another efficiency

20   enhancing aspect of the guidelines it has a separate rule

21   for smaller estates.  Smaller estates have higher risk, or

22   at least equal risk but lower return because of the value.

23   And so in order to encourage the firms to work on these

24   smaller estates it increases the percentage.  Again, an

25   efficiency enhancing aspect of the guidelines and that is

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1042 Page 101 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/16 Page 16 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 16

 1    borne out in the actual impact in the real world.

 2          Finally, if we could have the last slide.  Another

 3    sort of efficiency enhancing aspect of the guidelines not

 4    mentioned in the indictment but right there in black and

 5    white, and I'm going to focus on scenario B and C.

 6    Basically these scenarios show that the company that's there

 7    first, if that company finds superior heirs, not a cousin

 8    but say a niece or a nephew, then that company can reject

 9    the split, um, and there is -- or if only one company has

10    superior heirs and the other one had inferior heirs, that

11    the company can, with the superior heirs, can reject the

12    split also.  That's in paragraph B and C.  And again, that

13    is all toward encouraging the companies to do the best

14    research and find the best heirs quickly.

15          So there is a lot of efficiency enhancing aspects

16    written right into the language of the guidelines that are,

17    you know, critically important for the court to consider.

18          Your Honor, I'm -- moving on from the guidelines I

19    just want to speak briefly about Dan Mannix, he is my

20    client.  It's pretty obvious that the company is Kemp &

21    Associates and his name isn't Kemp so he is one of the

22    associates.  At the time the guidelines agreement was

23    entered into he had no ownership in the company, he wasn't

24    an officer.  The Kemp family owned the company, controlled

25    it, and they still do.

Case 2:16-cr-00403-DS  Document 110-2  Filed 12/14/16  PageID.1043  Page 102 of 140
Case 2:16-cr-00403-DS  Document 88  Filed 06/23/17  Page 17 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 17

1          At the time that the guidelines were entered into back
2     in around 2000, Dan was director of operations of the
3     company, but he was ousted from that position by Jeff Kemp
4     in 2005, he was demoted, and he didn't really reassume any
5     sort of leadership position in the company until 2007 when
6     he became owner of a small minority share and director of
7     operations again.  And it was a few months after Mr. Mannix
8     was given back authority in the company that he withdrew the
9     company from the guidelines in 2008, July of 2008.
10    Mr. Mitchell is going to speak more to that.

11         So Your Honor, and just Mr. Mannix is also one of the
12    top high school LaCrosse coaches in the State of Utah, for
13    what it's worth, which is actually quite a lot.

14         So why is the guidelines agreement properly analyzed
15    under the Rule of Reason and not -- and not the per se rule?
16    As we say in our papers, Rule of Reason is the general rule,
17    per se only applies in specific circumstances.  Particular
18    cases that have been recognized overtime and I think the
19    language I mean right out of the Tenth Circuit *Cayman*
20    *Exploration* case says the per se rule should not be applied
21    to a challenged practice until experience with a particular
22    kind of restraint enables the court to predict with
23    confidence that the Rule of Reason will condemn it.  Unless
24    the agreement falls squarely in the per se category, the
25    Rule of Reason applies.  That's a quote from the *Milk*

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1044 Page 103 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/16 Page 18 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 18

 1    *Antitrust* case.  There's many, many quotes in the cases that

 2    talk about how important it is to keep the per se rule in

 3    its place.  You have to look at the agreement as a whole,

 4    and you have to conduct a detailed and case specific

 5    analysis in the context of the particular industry.

 6         Now, we're not saying the government argues in their

 7    papers oh, the per se rule applies to all industries.  Okay,

 8    it can, but -- but you can't -- you can't apply it.  I mean

 9    if there were blatant price-fixing that would be a different

10    story.  But when you have a different kind of unusual kind

11    of agreement in an unusual kind of industry, both of which

12    you have here, you can't just stick it in per se in the per

13    se category particularly in a criminal case.  This is a

14    criminal case.

15         Now, as we have said, the government claims customer

16    allocation.  It doesn't fit the two recognized classic

17    cases, geographic or existing customers.  We pointed out in

18    our papers that we could not find any case that was

19    condemned per se that looks like the guidelines.  The

20    government in its response also failed to identify any case

21    that looks like the guidelines having that kind of unusual

22    structure of an occasional when efficient joint service of

23    clients and weighted profit sharing.  The government is

24    trying to squeeze this case into the template of the *Suntar*

25    *Roofing* case.  It doesn't fit.  It's just very different

1    kind -- I mean *Suntar* is your classic existing customer

2    allocation case, you know.  You don't service my -- my

3    construction companies for roofing, I won't service yours,

4    we won't compete for them.  That's it.  This case is not

5    near that.

6         So what are the unique aspects of the guidelines that

7    make it -- take it out of the classic customer allocation

8    agreement?  I have said it, but let me just try to list it.

9    The agreement sprung into effect only when it was efficient,

10   only when the two heir location firms had both invested the

11   significant resources to produce the same exact and unique

12   product which is the information relating to the same

13   estate.  That's the only time the agreement sprung into

14   effect.  And it was efficient at that point for both firms

15   to have one of them take the lead on the last phase of the

16   process which is the administration phase.  That's -- it's

17   an unusual circumstance, they both have done it, and in that

18   situation it's sufficient for one to take the lead rather

19   than duplicating the efforts.

20        And as I have said, we said in our papers, this is a

21   very limited group of estates.  Two and a half to three and

22   a half percent total of the total estates worked by Kemp

23   during the relevant period.  The guidelines, in addition,

24   they entailed the firm's pooling resources, information

25   regarding the identity and location of the heirs that they

1    have found.  They pooled those resources and used it jointly

2    to their mutual benefit and they also shared the risk of

3    loss, because once they came together, and had one firm take

4    the lead, if the case did not make it through to successful

5    conclusion, they pooled the risk of loss.  And that was --

6    that was a regular occurrence.  Not, you know, because a

7    will can show up, a superior heir can show up, and then

8    they're both having invested all this money, they're out.

9        We point out in our reply brief how the government

10   simply doesn't address these arguments.  They ignore the

11   administrative phase which we rely on repeatedly.  And as I

12   said, this phase is referenced right in the language of the

13   guidelines agreement because it's the documenting phase.

14       Your Honor, I want to mention briefly there is another

15   efficiency enhancing aspect of the guidelines, it's

16   mentioned in our papers but we actually have found a new

17   case on this that I want to mention.

18       THE COURT:  Now, this case is not mentioned in your

19   briefing?

20       MR. ALBERT:  I'm about to mention a case that we have

21   not mentioned, yes.  We mentioned the efficiency enhancing

22   aspect of the guidelines avoiding what we call blow ups.  So

23   this is another thing that makes this industry strange.

24   Because the product is this information, and once it's

25   revealed, in theory, somebody could go and seek -- seek

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.10471 Page 106 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/23/16 Page 21 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 21

1    their inheritance on their own, or they could use somebody.

2    So when both Blake & Blake and Kemp found themselves at an

3    heir and they had done the work on the same estate and they

4    found themselves, if one was angry and resentful and said

5    well, if I'm not going to get it nobody is going to get it,

6    they can reveal the information to the heir and there were

7    incidents of that where basically when Blake & Blake

8    believed it was not going to get the estate, was not going

9    to get the heirs, they would -- they would give the contact

10   information for the estate administrator right to the heir

11   to let them go do it on their own.  And that would -- now

12   and often people thought they could get the estate and they

13   wouldn't, it's basically heir location services are not

14   going to be part of this when that -- when Blake & Blake did

15   that.  That's tortious conduct.  That is tortious

16   interference with prospective economic advantage, it's

17   unfair competition, and it was something that Blake & Blake

18   was engaging in that led to the entering into the guidelines

19   in the first place.  And the Sherman Act recognizes, and

20   this is where the case comes in, the Sherman Act recognizes

21   that responding to tortious conduct can make conduct

22   reasonable under the Sherman Act.  And that's the case that

23   I am about to mention which is *Avaya, Inc. versus Telecom*

24   *Labs, Inc.*, 838 F -- 838 F.3d 354, it's Third Circuit 2016.

25   I have a copy, I'm going to hand a copy to the government.

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1048 Page 107 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/16 Page 22 of 55
Appellate Case: 17-4148   Document: 01019924689   Date Filed: 01/03/2018   Page: 22

1          THE COURT:  Do you have a copy for the court?

2          MR. ALBERT:  I think I only -- I only have one copy so

3     we will provide one.

4          THE COURT:  Very well.

5          MR. ALBERT:  But that case basically stands for -- I

6     mean in that case, a telecommunications equipment

7     manufacturer sued a manufacturer of -- a provider of

8     services for that equipment because it had previously, the

9     service provider, previously had a license and got access to

10    these proprietary maintenance codes and then the telecom

11    manufacturer terminated the contract and sued the

12    maintenance provider for continuing to access its

13    proprietary information after the contract was over, and so

14    sued for tortious interference and then the maintenance

15    company countersued for Sherman Act violations and saying

16    essentially you're trying to suppress competition for

17    maintenance services.  And the Third Circuit found that it

18    was error to dismiss the manufacturer's tort claims and

19    further found that the error tainted the jury's finding

20    against the manufacturer on the antitrust claims because if

21    the jury found that the maintenance company's conduct was

22    tortious, that could have made the manufacturer's alleged

23    anticompetitive conduct undertaken to combat tortious

24    conduct reasonable and not in violation of the Sherman Act.

25    That is -- that is another aspect of the guidelines and how

Case 2:16-cr-00403-DS  Document 110-2  Filed 12/14/16  PageID.1049  Page 108 of 140
Case 2:16-cr-00403-DS  Document 88  Filed 06/29/16  PageID.835  Page 23 of 55
Appellate Case: 17-4148     Document: 01019924689     Date Filed: 01/03/2018     Page: 23

1     they came to be, and I think that the *Avaya* decision clearly

2     stands for that proposition.

3          So Your Honor, our point is that, by their very

4     structure, the guidelines were efficiency enhancing, they

5     allowed for the pooling of resources in the estate

6     administration phase, they also were efficiency enhancing

7     because they provided a mechanism to address further

8     tortious conduct that Blake & Blake was engaging in and

9     blowing up -- blowing up estates.  And as we have said, the

10    efficiency enhancing was not just theoretical, it -- it

11    increased the proportion of smaller cases that were worked

12    and had a de minimus impact on price.  Whether for purposes

13    of antitrust doctrine you look at this as being reasonable

14    and justified because it's ancillary, um, to the increase in

15    efficiency, or whether you look at it as being effectively a

16    joint venture, um, under either of those two antitrust

17    doctrines we submit that the test for reasonableness is met

18    here, but for purposes of today, um, this motion, we believe

19    that the court can rule now that this -- that these unusual

20    guidelines can't be pigeonholed as on their face per se

21    violative of the antitrust laws and must be addressed under

22    the Rule of Reason and our view is that that leads to a

23    dismissal.  I don't think the government -- if the court

24    rules that this is a Rule of Reason case, I don't think the

25    government will pursue it further as a criminal case.  They

 1    might have the option to pursue it civilly, but not as a

 2    criminal case.  As we said, we think the court can rule that

 3    way now, but if the court thinks it would be useful to have

 4    a fuller factual record, we think the way to go on that is

 5    to have a hearing.  Um, there are a number of issues around

 6    the background of the guideline, their impact, the potential

 7    expert analysis of the market and the impact on the market,

 8    um, the pooling of resources that could be addressed, and we

 9    think that the appropriate way to address it is a hearing

10    prior to trial.  So Your Honor with that --

11         THE COURT:  Yes.  Let me -- let me just see if I have

12    the main thrust of your argument here in my notes.  Now this

13    agreement, and I think there is some question about the

14    termination, that is, whether the agreement there's a

15    violation of the statute of limitations here, I think that

16    is a valid argument or appears to be, but it seems to me now

17    your argument is focused on the agreement came into effect

18    only when the two firms had invested some considerable

19    amount of money in the venture; is that right?

20         MR. ALBERT:  Yes.

21         THE COURT:  That is number one.  Number two, that the

22    agreement was efficient enhancing, correct?

23         MR. ALBERT:  Yes.

24         THE COURT:  And number three, that only a small amount

25    of estates were involved in this -- that came into play

1    under the application of the agreement; is that correct?

2         MR. ALBERT:  Yes.

3         THE COURT:  All right.  Anything else?

4         MR. ALBERT:  And just that in the real world, the

5    impact of this agreement was actually helpful and not -- had

6    no negative impact on price.  Yes, those are the high

7    points, Your Honor.  Thank you with our request to reserve

8    time to respond to what the government adds.  By the way, I

9    don't know if the court wants to hear from Mr. Mitchell now.

10        THE COURT:  That is what I was going to ask next.  I

11   don't know if -- Ms. Kelley, do you want to respond to this

12   now, or do you want to wait until after we hear the argument

13   on the statute of limitations?

14        MS. KELLEY:  Your Honor, I'm happy to address it now.

15        THE COURT:  All right, very well.  You may do so.

16        MS. KELLEY:  May it please the court, Molly Kelley for

17   the United States.  Your Honor, I want to respond by

18   addressing two points.  First, I want to clarify the legal

19   standard that applies to this action.  Then I'll address why

20   the per se rule applies and how it applies here.

21        So first as the court well knows, this is a criminal

22   case and the Federal Rules of Criminal Procedure apply.  We

23   have a valid indictment, and counsel has raised a factual

24   dispute about the very nature of the charged agreement.  The

25   government objects to any consideration of factual material

1    outside of the indictment at this phase.  In fact, the

2    nature of the charged agreement is the ultimate question and

3    cannot be decided without a trial on the merits.  In

4    particular, I would like to draw the court's attention to

5    the Tenth Circuit case, *United States versus Pope*.  There,

6    the Tenth Circuit affirmed this court's correct decision to

7    deny a motion to dismiss that was based entirely on facts

8    outside of the indictment.  Also, the *Pope* court explained

9    that pretrial evidentiary hearings on the issue of guilt or

10   innocence, essentially a mini trial, isn't permitted under

11   the criminal rules.

12        Accordingly, the government requests that the court

13   disregard the extraneous facts including the guidelines

14   agreement and the charts that counsel just showed to Your

15   Honor.

16        We also requested the court decline to hold a pretrial

17   evidentiary hearing, and we request that the court permit

18   this matter to proceed to trial.  And at trial, the

19   government intends to prove exactly what we have alleged in

20   the indictment that this was a per se violation of the

21   Sherman Act.  And our evidence will go beyond the mere

22   guidelines document.  We will also have witnesses who will

23   explain how it operated exactly like a classic customer

24   allocation conspiracy.

25        So just to back up for a second, I want to just

 1    explain a little bit more about the per se rule.  Now,

 2    according to the Supreme Court, certain types of restraints

 3    are so predictably and predominantly anticompetitive that

 4    they are categorically deemed unlawful per se.  These

 5    categories of restraints include price-fixing, bid-rigging,

 6    and allocation, whether it be an allocation of territories,

 7    products or customers.  And as counsel correctly pointed

 8    out, if these restraints are present in any market, the per

 9    se rule can apply.

10         Now here the indictment alleges a customer allocation

11    agreement.  That is, an agreement between horizontal

12    competitors not to compete.  Now, an important point that I

13    want to make is that the indictment here, the offense

14    described in the indictment, is more than a mere label.  A

15    grand jury found probable cause to indict these defendants

16    for this offense.  Now in our paper we request that the

17    court make a pretrial ruling that the per se rule applies to

18    this case.

19         THE COURT:  Yes, I intend to do that, counsel.

20         MS. KELLEY:  Thank you, Your Honor.  In accordance

21    with the *Suntar Roofing* case.  So at trial I just want to

22    clarify how the per se rule will apply.  It's accurate that

23    the per se rule has evidentiary significance.  It forecloses

24    certain avenues for the defense to defend the case.  So, for

25    example, it would be improper and inadmissible for a

1    defendant in a per se antitrust case to essentially admit

2    what we call in an antitrust world a naked restraint of

3    trade.  But to say the jury should acquit because actually

4    the naked restraint was justified by a need to prevent

5    damage to the business.  Or the naked restraint was okay

6    because the prices at the end of the day were reasonable.

7    The per se rule says none of that is proper in a per se

8    antitrust case.

9          On the other hand, the per se rule does not foreclose

10   a defense that, in fact, this wasn't a naked restraint at

11   all.  In fact, the agreement was ancillary to some

12   legitimate joint venture.  A joint venture would be

13   characterized by a substantial integration, both partners

14   putting forward capital and technology to create something

15   new, sort of, for example, in the *Polk Brothers* case that

16   both parties cite, there, there was a product allocation

17   between the two parties, but that was necessary and related

18   to the creation of a joint retail facility and joint parking

19   lot.

20         If those defendants were in a criminal case, the jury

21   would have to acquit them because that would not be a per se

22   violation of the antitrust law.  Similarly, in the *BMI* case,

23   yes, there was a price-fixing agreement related to and in

24   support of the blanket copyright music licenses that they

25   were creating.  Similarly, if that had been a criminal case

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1055 Page 114 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/16 Page 29 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 29

1    and they had been charged with a per se violation of the

2    Sherman Act, the jury would have been instructed to acquit

3    because that's not a per se violation.  Here in the heir

4    location services industry, if a defendant were able to say

5    yes, there was a customer allocation but it was ancillary

6    and in support of some joint venture, say the creation of a

7    genealogical library or a genealogical database, something

8    new, then that too would not be a per se violation.  But

9    here, the government is aware of no such legitimate

10   collaboration between these defendants.  And, at trial, we

11   intend to show that this agreement operated exactly like a

12   classic garden variety customer allocation agreement.

13       Now, I'll just turn briefly to addressing some of the

14   questions that the court asked Mr. Albert.  Um, first the

15   court asked if it was the defendant's position that the

16   agreement only came into effect when the parties had

17   invested money into the venture.  That's irrelevant under

18   the *Cadillac Overall Supply* case that we cite in our brief.

19   That case involved the garment rental industry, and

20   defendants attempted to justify their agreement by saying,

21   without the allocation, there would be a substantial raise

22   on the account and it would -- that they would lose their

23   investment.  It's irrelevant in a per se antitrust case.

24       Next, the court asked Mr. Albert if it was the

25   defendant's position that the agreement was efficiency

 1    enhancing.  Well, what the *Polk Brothers* case teaches is

 2    that we look to the type of restraint at the time it was

 3    entered into.  And here, at trial, the government intends to

 4    prove that this was a classical customer allocation scheme

 5    at the time it was entered into.

 6          Additionally, Your Honor asked Mr. Albert if it's the

 7    defense position that only a small number of estates were

 8    affected.  This consideration is also irrelevant under the

 9    *United States versus Cooperative Theatres* case.  There the

10    defendants also tried to define the conduct by saying it

11    only affected a small amount of business.  That's

12    irrelevant.  Unless Your Honor has further questions on this

13    point, I will turn it over.

14          THE COURT:  No, that is fine.  You may -- you may be

15    seated, counsel.  Do you wish to respond to that now,

16    counsel, or do you want to reserve until after we hear the

17    argument on the statute of limitations?

18          MR. ALBERT:  I think we would like to respond now if

19    we could just have one moment, Your Honor.

20          THE COURT:  Yes, you may have a moment.

21          (Brief pause in proceedings.)

22          MR. ALBERT:  Your Honor, I'm going to try to be very

23    brief.  It is, of course, a legal ruling.  It is a legal

24    ruling as to whether this is per se or Rule of Reason.

25    There's no dispute about that.  The question is how and when

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1057 Page 116 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/23/17 Page 31 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 31

 1    can this court make that determination.

 2         In our view, the guidelines in and of themselves

 3    enable the court to say this is just not a classic.  It's

 4    just not -- it's just not one of the classics.  It's

 5    strange, it's unusual, and the industry is unusual.  And

 6    under those circumstances the court has enough to make that

 7    ruling at this time.

 8         Now, I must say it's surprising for the government to

 9    try to argue in my mind that the guidelines themselves the

10    court can't look at them.  It's just like a -- I mean it --

11    this case peculiarly is like a contract case.  In a contract

12    case, the party saying they breached or arguing anything

13    based a contract can't avoid people looking at the

14    agreement.  You know that is something that they are stuck

15    with.  And if you look at that agreement and you just can

16    basically consider how this industry generally works, you

17    can see it doesn't fit into the little narrow box.  And we

18    think the court can make that decision now.

19         With regard to whether there should be a hearing or

20    not, if the court wanted to have more information --

21         THE COURT:  I don't think I'm going to have a hearing,

22    counsel, so just go on.

23         MR. ALBERT:  Okay.  Um, Your Honor, another argument

24    that the government made is in order for this to be

25    efficiency enhancing it has to be something new, you have to

1    be creating something new.  That is -- that is not borne out

2    by the case law.  In the *BMI* case, it is -- that was not the

3    joint licensing for music was not something new, it existed.

4    In many of these cases, the product or service is not

5    something brand new, it's -- it exists, it's being made more

6    efficient, and it's being made more productive through the

7    existence of the agreement.  In every one of these cases

8    that the government argues or the plaintiff argues, that's

9    just a naked -- that's just a naked division of markets.

10   It's just a naked price fix.  And then you take two steps

11   back and you look at the whole thing and you see that it's

12   not naked.  And now -- and the government said and the

13   government this is a classical -- a classical horizontal

14   agreement but they have not identified any agreement that's

15   like it.  And when you look into the cases, that is what the

16   courts are doing.  They're searching through and they say,

17   you know, one of the cases is *Procaps* where a party argued

18   oh my gosh, we had a legitimate joint venture and then one

19   of the partners to the joint venture merged with another

20   company and then they took that company's manufacturing

21   capabilities off the market.  And that's changed this into a

22   naked horizontal agreement to reduce capacity because the --

23   no, you have to look at the whole thing.  You can't just

24   look at that one little aspect of it.  Yes, they took the

25   manufacturing capability off the market, but it was part and

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1059 Page 118 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/16 Page 33 of 55
Appellate Case: 17-4148      Document: 01019924689      Date Filed: 01/03/2018      Page: 33

```
 1      parcel of a whole economic relationship and all of these

 2      cases are about looking at the economic relationship.  And

 3      when you do that, um, when you do that, you can see that

 4      it's not a naked restraint.  The only other thing I would

 5      just point out is I think what the government is saying

 6      under their view of life, if the court doesn't grant --

 7      doesn't grant the motion, that evidence, all evidence that

 8      goes to whether it is per se or Rule of Reason comes in in

 9      front of the jury during the trial, and then presumably at

10      the end of it, we both move for the legal ruling and Your

11      Honor decides it.  That -- that is a way to go.  We don't

12      think it is the best way to go because then the jury is

13      going to be subject to a lot of evidence that either maybe

14      they shouldn't have heard or maybe they have heard for a

15      different reason and it would be a confusing trial for the

16      jury.  I just point that out to Your Honor.

17              THE COURT:  Very well.  Thank you, counsel.

18              MR. ALBERT:  Thank you.

19              THE COURT:  You may now address the statute of

20      limitations issue.

21              MR. MITCHELL:  Thank you, judge, appreciate your

22      patience.  Um, good morning, Your Honor.

23              THE COURT:  Good morning.

24              MR. MITCHELL:  My name is Jim Mitchell and I represent

25      Kemp & Associates, the corporate defendant.  And I am going
```

1    to address statute of limitations as everyone has said.  Um,

2    we have briefed these issues somewhat extensively already

3    for Your Honor and I certainly do not want to repeat

4    everything that was said, but there are a number of key

5    issues that I think would be worth emphasizing today.

6         So what are statute of limitations?  They exist for a

7    well established concern under the law.  That is repose.  A

8    person need not worry about defending him or herself from

9    charges relating to conduct that is invariably so old, in

10   some cases the evidence is stale, or in other cases just

11   completely not even there.  As a result, Your Honor, our

12   Supreme Court has said multiple times that statutes of

13   limitations should be liberally interpreted in favor of

14   this --

15        THE COURT:  Let me just -- let me just interrupt,

16   counsel.

17        MR. MITCHELL:  Please do.

18        THE COURT:  This agreement ended in 2008, right?

19        MR. MITCHELL:  It did, Your Honor.

20        THE COURT:  Now, the government argues that there were

21   facts however that extended that time.  Now, can you address

22   that?

23        MR. MITCHELL:  I certainly can, Your Honor.

24        THE COURT:  Very well.

25        MR. MITCHELL:  What happened, and I'll start by saying

```
 1        what happened in 2008 because it was alluded to by

 2        Mr. Albert.  On July 30th, 2008, Daniel Mannix, the

 3        defendant here, sent an e-mail to his administrative staff.

 4        And he basically said, and I'll quote it specifically for

 5        Your Honor so it's attached to Mr. Albert's declaration,

 6        what he wrote, quote, "the formal agreement that we have had

 7        with B&B for the last decade is over," end quote.  It

 8        couldn't be any clearer.  At that point this time, Your

 9        Honor, what happened and it's not only what Mr. Mannix said,

10        but it's played out by what actually happened, indeed there

11        were no more allocations of heirs under the guidelines after

12        July 30th, 2008.  The government, upon our request, gave us

13        a bill of particulars.  And we said to them give us a list

14        of all of the estates that are affected by the conspiracy.

15        And they gave us a list, it was 269 estates, Your Honor.

16        And we looked at that list and we went through it and we

17        determined that the very last date that any estate on that

18        list had ever been subject or made subject to the guidelines

19        by either Kemp or Blake & Blake was, in fact, July 30th,

20        2008.

21             So our view is, as Your Honor mentioned, that the

22        conspiracy, the scope of the conspiracy, the purpose of the

23        conspiracy, and the wrongful quote, societal danger that the

24        government is alleging here, is all over as of July 30th,

25        2008.  The government, of course, has a different view.
```

```
1    What the government says is that no, things happened after
2    2008.  There were things that happened in the form of
3    administration of the probate of the estates.  And what
4    happens, we don't deny it, Your Honor, once an estate is in
5    probate, there is a period of time that it has to actually
6    be probated.  And there are things that can make that
7    process of probate extend for any number of years and it can
8    vary.  Depends on what jurisdiction you're in, some
9    jurisdictions move faster than others.  Depends on how many
10   heirs there are.  Depends on sometimes new assets are found,
11   sometimes new heirs are found.  All of these things can
12   change the length and the nature of what happens.
13        THE COURT:  So why does that not toll the statute?
14        MR. MITCHELL:  Well, Your Honor, it doesn't toll the
15   status because it has nothing to do with the evil that is
16   charged in this indictment.  That is market allocation.  No
17   suppression of competition, no market allocation is going on
18   at all.  All that's happening in that period of time is the
19   routine processing of the probate.  The hiring the lawyers,
20   the gathering information.  Yes, there is trading back and
21   forth of -- of communications sometimes when necessary
22   between the heir location services and indeed as the
23   government points out, its indictment does have language in
24   it that says sometimes the money comes out, the heirs have
25   to be paid, and there is -- there is distribution of the
```

```
1    fees to the, excuse me, to the heir location service

2    company.  That is not what is charged as the wrongful

3    conduct.  That, Your Honor, are the results of the wrongful

4    conduct.  And we have cited a lot of cases for the court

5    that say when you have these types of situations where the

6    wrongful conduct, the thing that is the target of the

7    indictment is over, but there is some sort of tail,

8    something that happens after the fact, that is not -- it

9    doesn't require or it doesn't involve the actual wrongful

10   conduct that is so clearly charged in the indictment or

11   charged as the wrongful act, that doesn't equal extension of

12   the statute of limitations for purposes of the conspiracy.

13   And that's exactly what we have here, Your Honor.

14        Part of the problems, as well, statute of limitations

15   are very concerned with definiteness and not arbitrariness.

16   And if you took the government's position here, Your Honor,

17   they would have those issues in spades.  What would happen

18   here is because of the variability of the way these estates

19   are administered, because there are so many different ways

20   that things can slow down or speed up, someone market --

21   even if you did a wrongful market allocation of these heirs

22   back in 2008, you would have no way whatsoever to know

23   whether your statute of limitations was going to run five

24   years later, 10 years later, 20 years later.  It just

25   doesn't make any sense.  That's the real concern with all of
```

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1064 Page 123 of 140
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 38
Case 2:16-cr-00403-DS Document 88 Filed 06/29/17 Page 38 of 55

1    the cases under the law.

2         Of the cases, Your Honor, I know I'm skipping around,

3    I'm trying to answer Your Honor's question.

4         THE COURT:  Oh, no, I think you're doing okay.

5         MR. MITCHELL:  The cases that the court gets cited by

6    the government are different.  They're bid-rigging cases,

7    yes, but they have a significant difference in two different

8    ways from what our cases are, what our case is here and the

9    cases we cite.

10        One, in those cases, I'm going to read from -- in

11   those cases the court there -- the court in those cases was

12   able to conclude from the substance of what was being

13   charged that, in fact, the central purpose, scope of the

14   conspiracy, was economic enrichment, payment of money.

15   That, I submit, is not what we have here.  It is not what

16   they charged in the indictment.  If you look in the

17   indictment at the description of the offense, there is two

18   paragraphs under it and they both say only things about

19   market allocation and suppression and market allocation of

20   heirs.  Towards the end, when they have a list of a bunch of

21   things that say oh these are the manner and means of the

22   conspiracy, yes they mention the payment of money but that

23   is not the scope of this indictment as described.

24        The other thing that separates this case, Your Honor,

25   from their cases, is what I call the indefiniteness or

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1065 Page 124 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/16 Page 39 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 39

1    duration of the supposed wrongful conduct.  For example,

2    they cite and rely on two Tenth Circuit -- or one Tenth

3    Circuit and one, I think, Eighth Circuit bid-rigging cases

4    where they say that the -- or the court found that the

5    bid-rigging wasn't just the end of the statute of

6    limitations, didn't start the limitations period running,

7    but it extended through the point in time when the payment

8    for the underlying contract went on.

9         But in those situations, Your Honor, two of them, *U.S.*

10   *V Evans & Associates*, the bids were let in September of 1979

11   and the last payment on the contract was 1981.  Less than

12   two years.  The other one they rely on, *Northern Improvement*

13   *Company,* the project was awarded in March of 1980, and the

14   last payment was July of 1981.  In that case just a little

15   over a year.  That is very different, Your Honor, than the

16   situation we have here where if you took the government's

17   position, you would have many, many, many years that these

18   statute of limitations would remain open, and no one could

19   really tell, as I said at the outset, what -- what the end

20   of the day was going to be because there are so many events

21   and circumstances, all of the variables to how the estate is

22   administered that would never allow you to know what is

23   going to happen and when there is going to be a point in

24   time when you could actually say the statute of limitations

25   has started running or ended running.

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1066 Page 125 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/16 Page 40 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 40

 1          That, Your Honor, is the very reason we have statute

 2     of limitations in the first place, this concern with repose.

 3     And if you accept the government's view, that is going to be

 4     a very unworkable and contrary to congressional policy

 5     application here.

 6          One minute, Your Honor.  I did want to say, Your

 7     Honor, if you will allow me to go back to something.  Now,

 8     we have cited for Your Honor a number of cases where there

 9     is this problem, where there is this conduct that is the

10     wrongful conduct or the conduct in furtherance of the

11     conspiracy outside of the statute of limitations and there

12     is this tail that something that happens that goes past and

13     into the limitations period.  And we cited, Your Honor, a

14     bunch of the cases in our briefs *Dougherty* is one, the *Grimm*

15     case is one, the *Hare* case is another one.  I don't want to

16     go through those cases again, I'm happy to if Your Honor

17     wants me to, but there is one case that I kind of gave

18     short-shrift to in our brief and I think it is something

19     that I would like to walk through for the court because I

20     think is a really good example of this issue and sort of

21     crystalizes the very point I'm talking about.  It's called

22     *United States versus Great Western Sugar Company,* and it's

23     from the District of Nebraska, a 1930 case.  Granted it is

24     old, but it is very helpful, I think.

25          The case, Your Honor, concerns a price war that took

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1067 Page 126 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/23/16 Page 41 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 41

1    place in the beet sugar manufacturing industry.  As best as

2    I can understand it, this is an industry where companies

3    would buy the raw beet sugar from farmers, take it, process

4    it at their manufacturing plants and then sell it to some

5    ultimate customers.

6         Now, apparently some competitors learned that another

7    competitor was going to build a manufacturing plant in their

8    area and they got upset.  So what they did was they got

9    together and they conspired to basically buy up all of the

10   existing beet product from the farmers by paying exorbitant

11   prices for the beets, essentially cutting off the supply to

12   the guys who wanted to build the factory.  The result, Your

13   Honor, of course, was that contracts were signed where and

14   purchases were made of beets at inflated prices and that

15   lead these competitors to be indicted under the Sherman Act

16   for an illegal restraint of trade.  And a limitations issue

17   arises in this case for basically the reasons we have here.

18   The contracts that these sort of contracts that inflated

19   prices with wrongful prices, everybody acknowledged they all

20   existed outside of the five-year statute of limitations, or

21   it may have been three in that case, I can't remember,

22   outside the limitations period.  But what happened inside

23   the limitations period was that on occasion some of these

24   beets were delivered from the farmers to the manufacturers

25   and paid for.  So there was this activity within the period

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1068 Page 127 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/16 Page 42 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 42

 1    of time that the limitations period covered.  And the

 2    government, of course, relied on that to say aha, that makes

 3    this timely, those are acts in furtherance of the

 4    conspiracy, blah, blah, blah.  Well the courts correctly and

 5    I think in words that are really relevant here rejected that

 6    argument.  They said basically basing their view on what

 7    conduct was actually charged as wrongful in the indictment,

 8    this was not timely.  And here I'm going to quote Your Honor

 9    from the case.  Quote, "the act of price warfare was not the

10    acceptance of the beets or paying for them or slicing them

11    up in factories.  It was the price boost by offer to

12    contract at the accepted price and contracting," end quote.

13    The court went on to say that the delivery and the payment

14    for the beets were quote, "just things that transpired in

15    the course of business after the wrongful price war," end

16    quote.  And that is Page 154.

17        I think the parallel here is striking.  Even if the

18    conduct, the market allocation were wrongful, of course we

19    deny that and vehemently oppose that conclusion, but it

20    ended.  It ended in July of 2008.  And the tail, the routine

21    administration of the estates in this case were quote, "just

22    things that happened in the course of business after that

23    market allocation."  So I think it's pretty clear, Your

24    Honor, that the government is stretching here and they

25    didn't bring this case in a timely manner.  Frankly, they

```
 1        had every opportunity in our view to do that.  We have cited

 2        in our briefs some of the points -- some of the stuff we

 3        found in discovery that made clear that the government had

 4        people coming to them certainly in 2014 and apparently back

 5        as far as 2008 and '09 where this issue was being raised by

 6        people.  Now, an interesting side light to that, Your Honor,

 7        and I'll just throw it in here, statute of limitations are

 8        concerned with repose.  Apparently, on behalf of two former

 9        and disquieted employees of Kemp, they had somebody approach

10        the Department of Justice in San Francisco back in, I think,

11        2008 or '09.  We learned about this through discovery.  We

12        asked the government about it and said is there anything

13        more to this?  And they apparently checked with the San

14        Francisco office and found nothing.  Now I would find it

15        hard to believe that if that approach had happened, there

16        wouldn't be some record but it doesn't exist.  Now, I'm not

17        saying the government is hiding it, but so much time has

18        gone by that it's not there any more.  And that strikes me

19        as the very reason we have statute of limitations in the

20        first place to address concerns like that because it could

21        have been very helpful if we had a document to that point to

22        explain or see what happened here with the statute of

23        limitations.  So I'm happy to answer any questions that Your

24        Honor has but --

25                THE COURT:  Thank you, counsel.
```

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1070 Page 129 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/16 Page 44 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 44

```
1              MR. MITCHELL:  You're welcome.

2              THE COURT:  You may respond, Ms. Kelley.

3              MS. KELLEY:  Thank you, Your Honor.  Again, as the

4       court well knows, at this stage the court is bound by the

5       language of the indictment.  Here the indictment alleges a

6       broad conspiracy involving not only allocation, but also

7       payments derived from that allocation within the statute of

8       limitations.  And a commonsense reading of the indictment is

9       required.  Allocation is not an end in itself.  The object

10      was to profit from the allocation.  And specifically the

11      indictment alleges two types of payments that were part of

12      this conspiracy.  The indictment alleges that the

13      conspirators received noncompetitive contingency fees within

14      the statute of limitations and that's alleged at

15      Paragraph 11(h) and 11(i).  That type of payment delays the

16      statute of limitations under *Evans & Associates,* the Tenth

17      Circuit case.

18             Additionally, the indictment also alleges payoffs

19      between conspirators within the statute of limitations.

20      That also delays the statute of limitations under the *Morgan*

21      case and the *Triple A* and *Walker* cases from other circuits.

22             Now these payoffs between co-conspirators involves

23      continued concerted action, not mere administration, not

24      mere results of the conspiracy.  That's continued concerted

25      action and that tolls the statute of limitations.  The
```

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1071 Page 130 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/23/17 Page 45 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 45

1    government, having alleged as such, should be permitted to

2    prove these overt acts in furtherance of the conspiracy

3    within the statute of limitations to the jury at trial.  Now

4    to the extent the defendants are planning to submit a

5    withdrawal of defense, they will bear the burden of proof at

6    trial.  Unless the court has any questions for me?

7          THE COURT:  No.  I still am not clear.  Are you saying

8    that the statute of limitations does not apply to this case?

9          MS. KELLEY:  Your Honor, I'm -- I'm saying that the

10   indictment alleges overt acts within the statute of

11   limitations.  So the statute of limitations does not bar

12   this case.  And at trial, we will prove acts in furtherance

13   of the conspiracy that happened within five years of the

14   return of the indictment within the statute of limitations.

15         THE COURT:  Even though the agreement was terminated

16   in 2008?  Now I still don't understand your argument,

17   counsel.

18         MS. KELLEY:  So the -- first without waiving our

19   objection to consideration of facts outside of the

20   indictment, the alleged conspiracy is that there was an

21   allocation plus payoffs.  Even if the allocation of the

22   estates terminated in 2008, the conspirators continued to

23   profit from their conspiracy.  They continued to receive

24   noncompetitive contingency fees from their customers which

25   was the object of the conspiracy.  They also continued to

1    pay each other from the spoils of their conspiracy.  Both of

2    those overt acts, happening within the statute of

3    limitations, continues the conspiracy effectively.

4        THE COURT:  Okay.  Let's hear if there is any response

5    to your argument.

6        MS. KELLEY:  Thank you.

7        THE COURT:  Any response counsel?

8        MR. MITCHELL:  May I have two minutes, Your Honor?

9    Would that be okay?

10       THE COURT:  Pardon me?

11       MR. MITCHELL:  May I have two minutes?

12       THE COURT:  Yes.

13       MR. MITCHELL:  Thank you.  First of all, Ms. Kelley

14   uses the word payoffs.  That does not appear in the

15   indictment.  The indictment has a section at the end that

16   says manner and means of the conspiracy.  And that talks

17   about the fact that certainly there were a point in time in

18   all of these estates where the estate is probated and the

19   money comes out and it has to get paid to the heirs and to

20   the heir location services that actually did the work to

21   cause the money to come out.  That's what we're talking

22   about.  These are not the hidden payoffs.  This is the

23   routine compensation for the heir location services for

24   putting in what could be years of work to get the estate to

25   that point.  So that's not what I would call a payoff that

1    is part of the actual wrongful conduct being alleged.

2          The other thing, Your Honor, I just want to say, every

3    economic crime, I think you could say, has an object to make

4    money.  The question really is whether or not the substance

5    of the criminal act charged in the indictment is over and

6    when it's over.  And here I don't think I have ever seen a

7    clearer record where you have the actual defendant writing

8    an e-mail saying that agreement, that market allocation

9    agreement, is over as of this date.

10          And my last point, Your Honor, is although they seem

11    to want to push the indictment read as a whole and move from

12    the back to front what is the sort of the end of the day

13    payments that I'm talking about, you got to look at the

14    indictment because under the title description of the

15    offense there are two paragraphs.  They deal only with the

16    suppression of elimination of competition through market

17    allocation.  They don't say anything about the routine stuff

18    at the end including the fee payment.  So I think that it's

19    pretty clear what the indictment is saying is the wrongful

20    conduct which ended again in 2008.  Thank you.

21          THE COURT:  All right, very well.  Counsel, excuse me,

22    what I would like to do is meet with my staff attorney and

23    if I have any further questions I will come back on the

24    bench and indicate what questions I wish to have you further

25    address.  Or if there is a basis to make some oral ruling,

```
1     I -- I will make an oral ruling.  If not, I will take it
2     under advisement.  So those are the alternatives that will
3     be addressed here in your absence and then I will let you
4     know.
5          MR. ALBERT:  Your Honor, thank you.  I just, if I may,
6     I would like to hand up a copy of that Avaya case that I
7     mentioned that we --
8          THE COURT:  Yes, you may do so.
9          MR. ALBERT:  And I'll hand a copy.  It is a little bit
10    long to read but --
11         THE COURT:  I want to also mention I have in the jury
12    box two outstanding young men who are my externs during
13    their term of law school.  One is Brock Humberg, Brock, do
14    you want to raise your hand.  The other is Taylor Hadfield.
15    They're both outstanding young men.  And one of the great
16    benefits that these externs have, I believe, which I never
17    had when I was in law school, is to be with us and to meet
18    you and if they have any questions because we have
19    outstanding members of our noble profession here on this
20    case, that they can get the spirit of you outstanding
21    lawyers and maybe during this interim, unless they want to
22    come back and meet with me or I don't know, they haven't had
23    the benefit of going all through the briefing, but maybe
24    this would be a good time for them to meet with you.  Okay?
25         So we'll be in recess and I'll meet with my staff
```

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1075 Page 134 of 140
Case 2:16-cr-00403-DS Document 98 Filed 06/23/16 Page 49 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 49

```
 1          attorney assigned to the case.

 2              MR. ALBERT:  Thank you, Your Honor.

 3              THE COURT:  Thank you very much counsel for your

 4          presentation.  I think it has been very helpful and your

 5          briefing, I believe, has also been very well presented as

 6          far as your respective positions are concerned.

 7              MR. ALBERT:  Thank you.

 8              THE COURT:  Thank you very much.

 9              (Recess.)

10              THE COURT:  Again, counsel, thank you very much.  This

11          has been a -- is an interesting case and I'm going to give

12          you just some comment as to the court's inclinations.  It

13          does seem to me that this is a rather unique and unusual

14          case.  My view of the Sherman Antitrust Act involves cases

15          that this case does not, in my view, fit like I would like

16          to see cases fit under the Sherman Antitrust Act.

17              I'm going to take the issue of the statute of

18          limitations, I'm going to give that some further

19          consideration before I make a ruling on that.  I think,

20          again, this is -- because it is a rather unusual and

21          interesting case in my view that there may be some

22          application of the statute of limitations here that are

23          going to have to be applied possibly.  I'm not sure on that

24          yet.  I wanted to ask you, however, the question on the --

25          whether what standard applies here as to how this case
```

1    should be addressed under the Rule of Reason or the per se

2    standard.  My inclination is that it is a Rule of Reason

3    case or standard.  Now, what effect does that have, counsel,

4    can you tell me?

5        MS. KELLEY:  Yes, Your Honor.  Your Honor, the

6    government's position is that the per se rule applies to the

7    indictment.

8        THE COURT:  Yes, I understand.  You have made that

9    very clear, counsel.

10       MS. KELLEY:  In the event that Your Honor decides that

11   the Rule of Reason should apply, the government will

12   reassess its options at that point.  But --

13       THE COURT:  So maybe what I should do then is make

14   that ruling because that's my inclination is to find that it

15   is a Rule of Reason case because it is unique and unusual in

16   my view.  It doesn't affect a very large part of our

17   society, it's just very narrowly focused, and so that will

18   be my ruling.  Now, if that -- and then hold in reserve the

19   statute of limitations or do you want me to rule on that

20   too?

21       MS. KELLEY:  If Your Honor sees fit to rule at this

22   time, it's Your Honor's prerogative.

23       THE COURT:  Yes, that's my -- well, counsel, maybe I

24   should ask the defendants in that regard.  Did you

25   understand what I am --

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1077 Page 136 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/29/16 Page 51 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 51

 1          MR. ALBERT:  I do, Your Honor.  Um, we think that Your

 2    Honor's ruling on the Rule of Reason will likely complete

 3    the case so --

 4          THE COURT:  Well, what part will that complete?

 5    That's the part that I'm concerned with here.  It seems to

 6    me, based on what I've said, and what I have heard, that it

 7    is my view because it is unique, it is unusual, it doesn't

 8    seem to me to fit the classic Sherman Antitrust Act type

 9    cases and that the -- it seems to me that it is a Rule of

10    Reason standard.  Now am I saying that correct?

11          MR. ALBERT:  Yes, Your Honor, I think you are saying

12    it quite right.

13          THE COURT:  Yes.

14          MR. ALBERT:  I mean I, you know, I guess the ball is

15    in the government's court, but I don't think the government

16    is likely to continue to proceed in a rule of reason case.

17          THE COURT:  Maybe I don't need to address the statute

18    of limitations then.

19          MR. MITCHELL:  Well, and Your Honor, if I may, I don't

20    mean to interrupt but if -- if Your Honor -- given Your

21    Honor's view of the Rule of Reason, I, again, am not sure

22    what the government's response would be, whether it is

23    anticipated though they might try to appeal that issue.  If

24    that were to be the case, I think it might be as a matter of

25    practical benefit to have, if there is going to be a statute

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1078 Page 137 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/23/16 Page 52 of 55
Appellate Case: 17-4148     Document: 01019924689     Date Filed: 01/03/2018     Page: 52

1    of limitations issue that they need to address or we need to

2    address, to have that essentially be part of the appeal

3    issue as well.

4         THE COURT:  Well, I agree with that as well.  Do you

5    want to consider this first under the Rule of Reason

6    position that the court is taking, and then indicate whether

7    you are going to move forward.  If you are, then I will -- I

8    will rule on the statute of limitations before anything

9    further is done.

10        MS. KELLEY:  Your Honor, the government does not see

11   that it will move forward with a Rule of Reason case.

12        THE COURT:  I didn't understand that, counsel.  The

13   government would not what?

14        MS. KELLEY:  If Your Honor decides to proceed under a

15   Rule of Reason, the government would like to assess its

16   options.  But as we said in our paper, we don't intend to

17   pursue a Rule of Reason case.

18        THE COURT:  Well then --

19        MR. ALBERT:  I'm sorry, Your Honor.  I think

20   Mr. Mitchell actually had a good point.  I think that we

21   have the court's ruling that it is Rule of Reason.  I think

22   that there is at least a chance that the government will

23   appeal, we hope they won't, we hope that we could resolve it

24   and maybe -- maybe we could.  But, um, if the government

25   does appeal, um, I think they would probably -- everyone --

Case 2:16-cr-00403-DS Document 110-2 Filed 12/14/16 PageID.1079 Page 138 of 140
Case 2:16-cr-00403-DS Document 88 Filed 06/23/16 Page 53 of 55
Appellate Case: 17-4148    Document: 01019924689    Date Filed: 01/03/2018    Page: 53

```
 1    it would be useful for everyone to have a ruling on the

 2    statute of limitations.  So, um, one option, if your court

 3    may, would be to we have that ruling, we could speak to the

 4    government and see and then get back to the court in a few

 5    days.

 6         THE COURT:  I think that would be the way that I would

 7    like you to proceed, counsel.  Is that okay?

 8         MS. KELLEY:  Yes, Your Honor.

 9         THE COURT:  All right.  And then indicate that to the

10    court and then I will decide it or maybe I won't have to

11    decide, but either the case will be done or the court will

12    then rule on the statute of limitations issue.

13         MR. ALBERT:  Thank you, Your Honor.

14         MR. MITCHELL:  Thank you, Your Honor.

15         THE COURT:  Well, counsel, you have been wonderful and

16    I just appreciate you and I hope you had a great exchange

17    with my externs.  I didn't mention they are both in their

18    second year at the J. Reuben Clark Law School at the Brigham

19    Young University and it's just wonderful to have these young

20    students in the law become great professionals such as you.

21    Okay.  All right.  We'll be in recess then, counsel.  Thank

22    you very much.

23         MR. ALBERT:  Thank you, Your Honor.

24         THE COURT:  You want to prepare an order for the court

25    to sign?
```

1           MR. ALBERT:  We will, Your Honor.

2           THE COURT:  All right, very well.

3           MR. ALBERT:  Thank you.

4           THE COURT:  Thank you.  We'll address down the road,

5    if necessary, another trial date or whatever but that is

6    stricken for now.

7           MR. ALBERT:  Thank you, judge.

8           MR. MITCHELL:  Thank you, Your Honor.

9           (Whereupon, the hearing concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF UTAH            )

 2                             )ss

 3    COUNTY OF SALT LAKE      )

 4

 5            I, Laura W. Robinson, Certified Shorthand

 6    Reporter, Registered Professional Reporter and Notary Public

 7    within and for the County of Salt Lake, State of Utah, do

 8    hereby certify:

 9            That the foregoing proceedings were taken before

10    me at the time and place set forth herein and were taken

11    down by me in shorthand and thereafter transcribed into

12    typewriting under my direction and supervision;

13            That the foregoing pages contain a true and

14    correct transcription of my said shorthand notes so taken.

15            In witness whereof I have subscribed my name

16    this 26th day of June, 2017.

17

18                         _____

19                         Laura W. Robinson

20                         RPR, FCRR, CSR, CP

21

22

23

24

25
```