# Attachment 4

No. 17-4148

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

UNITED STATES OF AMERICA

*Plaintiff - Appellant*,

v.

KEMP & ASSOCIATES, INC. AND DANIEL J. MANNIX,

*Defendants - Appellees*.
_____

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF UTAH
Honorable David Sam
District Court No. 2:16-cr-00403-DS
_____

**REPLY BRIEF FOR THE UNITED STATES OF AMERICA**

_____

MAKAN DELRAHIM
  *Assistant Attorney General*

ANDREW C. FINCH
  *Principal Deputy Assistant Attorney General*

MARVIN N. PRICE, JR.
  *Acting Deputy Assistant Attorney General*

KALINA M. TULLEY          KRISTEN C. LIMARZI
ROBERT M. JACOBS          JAMES J. FREDRICKS
RUBEN MARTINEZ, JR.       ADAM D. CHANDLER
MOLLY A. KELLEY           JONATHAN H. LASKEN
  *Attorneys*                *Attorneys*
  U.S. Department of Justice  U.S. Department of Justice
  Antitrust Division          Antitrust Division
                              950 Pennsylvania Avenue, NW
                              Room 3224
                              Washington, DC 20530-0001
                              202-305-7420

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ................................................................. 1

ARGUMENT ................................................................. 2

   I.  The Indictment Was Timely Because the Conspiracy Continued
     While the Conspirators Collected and Distributed Proceeds from
     Allocated Customers ................................................................. 2

  II.  The District Court Erred in Dismissing the Per Se Charge ........ 10

     A.  The Defendants Are Wrong That Only "Certain" Naked
       Customer Allocation Agreements Are Unlawful Per Se ........ 11

     B.  Defendants' Factual Assertions Would Not Support an
       Ancillary Restraints Theory of Defense, and Even If They
       Offered an Adequate Factual Basis for the Theory, It Is for
       the Jury to Resolve at Trial ................................................ 17

     C.  The Rule of Lenity Does Not Apply ................................... 26

     D.  18 U.S.C. § 3731 Provides Appellate Jurisdiction To Review
       the Per Se Issue, and If Not, Mandamus Is Appropriate ....... 28

CONCLUSION ................................................................. 34

CERTIFICATE OF COMPLIANCE ....................................... 35

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY
REDACTIONS ................................................................. 36

CERTIFICATE OF SERVICE ............................................... 37

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332 (1982)...................15

*Barber v. Thomas*, 560 U.S. 474 (2010)...................27

*Bauman v. U.S. Dist. Court*, 557 F.2d 650 (9th Cir. 1977)...................33

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
   441 U.S. 1 (1979)...........................................................16, 17

*Callanan v. United States*, 364 U.S. 587 (1961).......................8

*Costello v. United States*, 350 U.S. 359 (1956).......................23

*FTC v. Superior Court Trial Lawyers Ass'n*,
   493 U.S. 411 (1990)...............................................13, 16, 27

*Gabelli v. SEC*, 568 U.S. 442 (2013).......................10

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
   744 F.2d 588 (7th Cir. 1984)...................................16

*Hammes v. AAMCO Transmissions, Inc.*,
   33 F.3d 774 (7th Cir. 1994).......................................13, 14

*In re United States*, 578 F.3d 1195 (10th Cir. 2009)........................32, 33

*In re Volkswagen of Am., Inc.*, 545 F.3d 304 (5th Cir. 2008)..................32

*Kokesh v. SEC*, 137 S. Ct. 1635 (2017).......................10

*Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998).......................17

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ................................................................. 15

*Lockhart v. United States*, 136 S. Ct. 958 (2016) ..................................... 27

*Nat'l Soc. Of Prof'l Engineers v. United States*,
   435 U.S. 679 (1978) ................................................................. 30

*NCAA v. Board of Regents of the University of Oklahoma*,
   468 U.S. 85 (1984) ............................................................. 16, 17

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
   472 U.S. 284 (1985) ........................................................... 12, 13

*Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990) ............................... 21

*Polk Bros., Inc. v. Forest City Enterprises, Inc.*,
   776 F.2d 185 (7th Cir. 1985) ............................................... 19, 20

*Polygram Holding, Inc. v. FTC*, 416 F.3d 29 (D.C. Cir. 2005) ............... 22

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) ............................................. 18, 20

*SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958 (10th Cir. 1994) ........... 19

*Skilling v. United States*, 561 U.S. 358 (2010) ....................................... 28

*United States v. A-A-A Elec. Co.*, 788 F.2d 242 (4th Cir. 1986) ............... 3

*United States v. Andreas*, 216 F.3d 645 (7th Cir. 2000) ......................... 12

*United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998) ............................ 28

*United States v. Davis*, 766 F.2d 1452 (10th Cir. 1985) ............................ 4

*United States v. Delatorre*, 157 F.3d 1205 (10th Cir. 1998) ................... 28

iv

*United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989) .........................7, 8

*United States v. Dynalectric Co.*, 859 F.2d 1559 (11th Cir. 1988)........4, 5

*United States v. Evans & Associates Construction Co.*,
   839 F.2d 656 (10th Cir. 1988)..........................................................3, 9

*United States v. Flom*, 558 F.2d 1179 (5th Cir. 1977) ...........................13

*United States v. Great Western Sugar Co.*,
   39 F.2d 152 (D. Neb. 1930) ..................................................................9

*United States v. Grimm*, 738 F.3d 498 (2d Cir. 2013)..........................7, 8

*United States v. Hall*, 20 F.3d 1084 (10th Cir. 1994)..............................25

*United States v. Hare*, 618 F.2d 1085 (4th Cir. 1980).........................6, 7

*United States v. Kissel*, 218 U.S. 601 (1910) ..........................................10

*United States v. Levasseur*, 846 F.2d 786 (1st Cir. 1988)................29, 30

*United States v. Mfrs.' Ass'n of Relocatable Bldg. Indus.*,
   462 F.2d 49 (9th Cir. 1972).................................................................29

*United States v. Morgan*, 748 F.3d 1024 (10th Cir. 2014)...............3, 4, 9

*United States v. McVeigh*, 119 F.3d 806 (10th Cir. 1997).................30, 31

*United States v. Northern Improvement Co.*,
   814 F.2d 540 (8th Cir. 1987).........................................................4, 5, 6

*United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010) ..............18, 24, 26

*United States v. Reicher*, 983 F.2d 168 (10th Cir. 1992)............13, 14, 27

*United States v. Schneider*, 594 F.3d 1219 (10th Cir. 2010) ...........29, 31

*United States v. Socony-Vacuum*, 310 U.S. 150 (1940)............................27

*United States v. Suntar Roofing, Inc.*,
   897 F.2d 469 (10th Cir. 1990)....................................................11, 23, 27

*United States v. Todd*, 446 F.3d 1062 (10th Cir. 2006) ....................23, 24

*United States v. Welch*, 327 F.3d 1081 (10th Cir. 2003).........................24

*United States v. Wexler*, 31 F.3d 117 (3d Cir. 1994) ..............................33

*Will v. United States*, 389 U.S. 90 (1967) ..............................................31

## FEDERAL STATUTES AND RULES

18 U.S.C.:
   § 201(g) .................................................................................................6
   § 3282(a) .............................................................................................10
   § 3731.............................................................................................11, 28

28 U.S.C. § 2462..................................................................................... 10

Fed. R. Civ. P. 56 ...................................................................................25

# INTRODUCTION

Defendants fail to grapple with the obvious: the conspiracy to suppress competition, as alleged, was for financial gain and was carried out by allocating customers and collecting and dividing the intended gain—the proceeds on the allocated customers' contracts.  Under controlling precedents, such a conspiracy (1) lasts as long as its members collect or divide those proceeds and (2) is per se unlawful.  Defendants' incorrect suggestion that the court below appropriately conducted a pre-trial factual inquiry subject to clear error review badly misunderstands the jury's role as the ultimate finder of fact.  Testing of the indictment's allegations must await trial.  And even if defendants' specific factual assertions were taken as true, that would not undermine the conclusions that the conspiracy continued to January 2014, that the per se rule applies, and that the customer allocation was not ancillary to a productive joint venture.

## ARGUMENT

### I.    The Indictment Was Timely Because the Conspiracy Continued While the Conspirators Collected and Distributed Proceeds from Allocated Customers

Defendants' arguments and the district court's decision are based on two false premises: (1) the conspiracy ended if the defendants stopped allocating customers, and (2) the conspiracy's goals did not include financial gain, Opp. 10, 24-25.[1]  Decisions in this circuit (and others) squarely hold that a conspiracy to eliminate competition for contracts, like the one charged here, continues as long as the conspirators receive and divide the scheme's intended financial gain, the proceeds on the contracts.  Defendants do not dispute that they received and divided those proceeds within five years of indictment, nor do they deny that the indictment alleged that the conspiracy continued to January 2014 as it was furthered by that receipt and division.  A18-A20.  Accepting those allegations as true, the indictment is timely.

1. <u>The conspiracy did not end in 2008</u>.  Even if (as defendants claim) they stopped allocating customers in 2008, that does not mean the

---

[1] "Br." refers to the government's opening brief, and "Opp." to defendants' answering brief.

conspiracy came to an end.  In *United States v. Evans & Associates Construction Co.*, the conspirators agreed to rig bids for only one contract, and this Court held that the conspiracy did not end after that contract was awarded—when there were no further contracts to rig or competition to suppress—but instead continued while a conspirator received "any money" on the contract.  839 F.2d 656, 661 (10th Cir. 1988); *accord United States v. A-A-A Elec. Co.*, 788 F.2d 242, 244-45 (4th Cir. 1986) (holding that "Sherman Act conspiracy [to rig bidding for single project] continues through the time of illegal payoffs and receipt of payments").

Moreover, the conspiratorial agreement included splitting the proceeds from allocated customers, and defendants and their co-conspirators continued to abide by that crucial aspect of the agreement as they made payoffs to one another.  The payoffs were a fundamental element of the scheme—the consideration underlying the agreement not to compete—and the means by which they shared the conspiracy's ill-gotten gains.  *See* A19 (¶¶ 11(b)-(c)).  As this Court observed in *United States v. Morgan*, "[i]t is well settled that the distribution of the proceeds of a conspiracy is an act occurring during the pendency of the

3

conspiracy."  748 F.3d 1024, 1036-37 (10th Cir. 2014) (quoting *United States v. Davis*, 766 F.2d 1452, 1458 (10th Cir. 1985), and collecting cases).

*Morgan* confirms the obvious intuition that obtaining a ransom payment and dividing it among co-conspirators both further the objectives of a kidnapping conspiracy.  *Id.*  Completing the abduction does not somehow terminate the conspiracy, and the process of dividing up the scheme's proceeds is "actual conduct in furtherance of it," not the mere "results of a conspiracy," A141.  The same is true when companies realize and distribute the value derived from a conspiracy to suppress competition.  In *Morgan*, the Court specifically rejected an attempt to distinguish a kidnapping conspiracy from *United States v. Dynalectric Co.*, 859 F.2d 1559 (11th Cir. 1988), an antitrust conspiracy to suppress competition for contracts, because *Dynalectric* "can reasonably stand for the proposition that the conspiracy does not end until all the money has been distributed." *Morgan*, 748 F.3d at 1037 n.15.  Similarly, *United States v. Northern Improvement Co.* likened the payments on contracts in an antitrust case to ransom payments in a kidnapping case.  814 F.2d 540, 542 (8th Cir. 1987).

4

2.  <u>Financial gain was a goal of the conspiracy</u>.  Defendants cannot

plausibly deny that the goals of the charged conspiracy included

financial gain, Opp. 24-25.  It is "inconceivable . . . that anybody would

attempt to restrain trade without also having the further goal of

financial self-enrichment by virtue of the restraint of trade."

*Dynalectric*, 859 F.2d at 1568.  That is why the courts of appeals,

including this Court in *Evans*, recognize that a charged conspiracy to

restrain trade by suppressing or eliminating competition for contracts

continues until a conspirator accepts the last payment on the contract.

Br. 15-16 & n.3.

In *Northern Improvement*, for example, the defendants were charged

with entering into a "bid-rigging agreement with the expectation that

[the agreed upon] low bidder would be awarded the project and paid" for

its work, and with "receiving and accepting * * * payments for work

performed."  814 F.2d at 542.  "As indictments are to be read in a

common sense, nontechnical manner," the Eighth Circuit did "not doubt

that this indictment [was] broad enough to encompass the event—

receipt of payment—on which the government relie[d] to bring the

defendants' activities within the statute of limitations."  *Id.*  The

conspiracy's purpose "was not merely to restrain competition for the satisfaction of violating the Sherman Act," because "[c]ommon sense tells us that the conspirators' purpose was to reap the benefit of the conspiracy." *Id.*

The same is true here. *See* Br. 19-22 & nn.4-7. The "trade and commerce" allegedly restrained consists of the transactions between the conspirators (including defendants) and the allocated customers, including payments the conspirators received and divided up within the limitations period. A18-A20 (¶¶ 9, 11(i), 12).

Defendants all but ignore *Evans* and other directly on-point cases and instead rely primarily on three cases that do not support the decision below. None involved prosecutions for violating the antitrust laws (despite defendants' contrary assertions, Opp. 2, 22). *United States v. Hare* is not even a conspiracy case. 618 F.2d 1085 (4th Cir. 1980). There, the defendant was charged under 18 U.S.C. § 201(g), which prohibits the receipt of anything of value by an official for an official act. *Id.* at 1086. The thing of value the defendant allegedly received was a favorable loan, but *not* smaller loan repayments or forbearance from legal action after default. *Id.* at 1087. Consequently,

6

the prosecution could not rely on the defendant's receipt of those other things to show the offense continued (and the court expressly limited its holding to the facts alleged in the indictment). *Id. Hare* sheds no light on whether a conspiracy to suppress competition for contracts (as alleged here) continues as long as the conspirators collect the contracts' proceeds and share a portion as payoffs for not competing.

The other cases actually support the government. They indicate that the division and distribution of ill-gotten gains between defendants and their co-conspirators, as alleged here, continue a conspiracy because such payoffs reflect concerted activity and thus extend a conspiracy for statute-of-limitations purposes. *See* Br. 25-26 & n.10. In *United States v. Grimm*, which involved fraud conspiracies, the court recognized that *A-A-A Electric* was consistent with its approach because it involved "continued concerted action," *i.e.*, "payoffs to co-conspirators [that] continued after award of contract." 738 F.3d 498, 504 n.6 (2d Cir. 2013).

Likewise, in *United States v. Doherty*, which involved conspiracies to obtain and distribute advance copies of police exams, the court held that payoffs from one conspirator to another, years after the exams were

7

obtained and distributed, demonstrated that the conspiracy continued for limitations purposes. 867 F.2d 47, 61-62 (1st Cir. 1989). It rejected the limitations defense for those convicted of conspiracy counts alleging that one conspirator agreed to provide the exams "in return for services and favors" because, while the theft and distribution of the exams occurred outside the limitations period, the favors and services occurred inside it. *Id.* at 62. Based on these payoffs, the court rejected the conclusion that higher "salary payments took place after all other, joint activities had ceased, *i.e.,* after all special conspiracy-associated dangers had dissipated." *Id.*

Defendants' only response is to mischaracterize the "societal danger" as the suppression of competition. Opp. 25. But, as the courts made clear, the special societal danger of conspiracy is not found in a particular conspiracy's object, but rather arises from the "collective" nature of "criminal agreement," which is a matter of special concern because "group criminality" "presents greater threat to the public than individual criminality." *Doherty*, 867 F.2d at 61 (citing *Callanan v. United States*, 364 U.S. 587, 593-94 (1961)); *see Grimm*, 738 F.3d at 504. *Grimm* and *Doherty* recognize that payoffs among conspirators are just

8

this type of concerted action and thus that the conspiracies in *A-A-A Electric* and *Doherty* continued even though the competition for the contract had already been suppressed (*A-A-A Electric*) and the exams stolen and distributed (*Doherty*).  If *Grimm* and *Doherty* were interpreted to mean that a conspiracy to suppress competition for contracts ends before the "distribution of the proceeds of a conspiracy" is complete, *Morgan*, 738 F.3d at 1036-37, or before a conspirator accepts "the last payment on the contract" with "no division of [any] payments among the conspirators," *Evans*, 839 F.2d at 661, they would conflict with this Court's precedents.

Defendants' reliance on *United States v. Great Western Sugar Co.*, 39 F.2d 152, 153 (D. Neb. 1930), is also misplaced.  There, a sugar refiner was charged with conspiring to exclude a rival by outbidding it on contracts to purchase sugar beets.  The court dismissed the prosecution, concluding that the harm was complete when the manufacturer outbid its rival, and that the manufacturer's subsequent beet purchase did not continue the conspiracy.  *Id.* at 154.  Unlike here, purchasing the beets did not result in the ill-gotten gain intended by the conspirators.  Even

if *Great Western Sugar* were on point, it cannot overrule *Evans* or *Morgan*.

Lastly, defendants' reliance on two SEC cases is also unavailing. *Gabelli v. SEC* merely held that statute of limitations applicable to the fraud claim, 28 U.S.C. § 2462, ran not from the discovery of the fraud (as the SEC urged) but from when the fraud occurred.  568 U.S. 442, 447-50 (2013); *cf. Kokesh v. SEC*, 137 S. Ct. 1635, 1642 (2017) (applying Section 2462 to disgorgement claim).  These cases do not support defendants' claim of "arbitrariness," Opp. 27.  The government is not urging a discovery rule, but rather the well-established rule that the five-year limitations period under 18 U.S.C. § 3282(a) runs not from the first moment the conspiracy could be charged but from when the conspiracy ends.  *See United States v. Kissel*, 218 U.S. 601, 607-08 (1910).

## II.   The District Court Erred in Dismissing the Per Se Charge

The indictment charges, and alleges facts supporting, a naked customer allocation agreement that is a per se violation of the Sherman Act.  Defendants' attempt to narrow the category of per se unlawful customer allocation agreements is contrary to precedent and would

10

undermine the per se rule.  Although defendants argue that their

agreement is merely ancillary to a legitimate collaboration, their

proffered facts—even if true—fail to establish an ancillary restraint.  In

any event, it was error for the district court to look beyond the

indictment to evaluate such an argument.  Because the district court

dismissed a substantive theory of a Sherman Act violation, this Court

has jurisdiction under 18 U.S.C. § 3731.  Should the Court conclude it

lacks appellate jurisdiction, mandamus is appropriate to correct the

patently erroneous decision.

## A. The Defendants Are Wrong That Only "Certain" Naked Customer Allocation Agreements Are Unlawful Per Se

Defendants concede that one category of per se unlawful agreements

are customer allocation agreements.  Opp. 42 (citing *United States v.*

*Suntar Roofing, Inc.*, 897 F.2d 469, 473 (10th Cir. 1990)).  Contrary to

defendants' argument, the indictment here did not invoke a label, but

instead described in substance a customer allocation agreement

between competitors, Br. 31-32.

Tellingly, defendants identify no deficiency in the indictment that

renders it insufficient to allege a customer allocation.  Instead,

11

defendants make the baseless assertion that only "certain forms" of customer allocations are per se unlawful.  Opp. 42.  But the category of per se unlawful customer allocations is not narrowly confined to agreements in which "competitors agree to cede away some defined, pre-existing segment of each other's customers," Opp. 42.  Defendants cite no case asserting this limitation, nor do they argue that the rationale of the per se rule supports it.  Rather, they contend that prior cases invoking the per se rule against customer allocations fit this narrow pattern.  But that a particular "scheme did not fit precisely the characterization of a prototypical per se practice does not remove it from per se treatment." *United States v. Andreas*, 216 F.3d 645, 667 (7th Cir. 2000) (upholding Sherman Act conviction).

If the law were otherwise, peculiar practices of many businesses—or minimal creativity by defendants—might take many conspiracies in restraint of trade outside the Sherman Act's established per se categories.  Such an approach would not only undermine the per se rule, which "permits categorical judgments with respect to certain business practices," but would also impose the "'significant costs' in 'business certainty and litigation efficiency'" that the per se rule avoids.  *Nw.*

12

*Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289-90 (1985); *see FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 433-34 (1990) (*SCTLA*).

Defendants incorrectly argue that prior cases condemning customer allocations as per se illegal involved "repeat customers," Opp. 42-43.  No case imposes such a limit on the per se rule.  As the government explained, Br. 31-32, the defendants in *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774 (7th Cir. 1994), allocated only new customers, and there is no reason to think any of them would become repeat customers.  Much the same was true in *United States v. Flom*, 558 F.2d 1179 (5th Cir. 1977).  Defendants unsuccessfully attempt to distinguish *Flom* because bids were used to effectuate the customer allocation, Opp. 44, but the courts treated the conduct as a customer allocation: the district court applied the rule that "a contract allocation scheme in interstate commerce is a per se violation of the Sherman Act," and the Fifth Circuit rejected the defense argument that the indictment "failed to enunciate with specificity the contracts allocated." 558 F.2d at 1183.  Similarly here, the allocation scheme was carried out by one conspirator submitting an offer while the other refrained from

13

submitting an offer.  A19 (¶ 11(g)).  *Cf. United States v. Reicher*, 983 F.2d 168, 170 (10th Cir. 1992) (defining bid rigging as an agreement among competitors pursuant to which offers are to be submitted to or withheld from a third party).

Moreover, a customer allocation is just as destructive of competition whether or not there are repeat customers.  In either instance, any allocated customer "faces a monopoly seller" and is deprived of the benefits of competition.  *Hammes*, 33 F.3d at 782.  This naked elimination of competition by agreement explains why "an out-and-out scheme of customer allocation [is] a per se violation."  *Id.*

Defendants' argument that a territorial allocation agreement would have eliminated competition more efficiently, Opp. 43, is dubious, Br. 35, and irrelevant.  The potential for an alternative cartel scheme—even if superior—cannot conceivably negate the per se illegality of the scheme actually undertaken.  While defendants attempt to characterize their scheme narrowly—as being more "targeted" than a territorial allocation and governing "a very limited subset of estates," Opp. 43—the indictment alleged that conspirators agreed to eliminate head-to-head price competition between them on *every* estate *everywhere* in the

14

country where such competition would have existed.  (In any event, there is no exception to the per se rule for "targeted" conspiracies, Br. 35-36.)

Defendants are also incorrect to assert that the "unusual manner of operation" of the heir location services industry somehow justified a departure from the per se rule.  The Supreme Court has unambiguously rejected "the argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation." *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351 (1982); *see* Br. 36-37.  Indeed, the wide variety of industries in which defendants concede the per se rule has been applied to customer allocation agreements, Opp. 47, only underscores the categorical nature of the rule.  Accepting the argument that the per se rule must be separately reestablished based on purportedly "unusual" circumstances in each industry "ignores the rationale for per se rules," 457 U.S. at 351, and would destroy the rule's nature, which "treat[s] categories of restraints as necessarily illegal [to] eliminate[] the need to study the reasonableness of an individual restraint." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).

15

While the district court may have been "skeptic[al] that the economic impact of the Guidelines would be the same as it might have been in a more traditional industry," Opp. 48, that skepticism is unfounded, Br. 37, 40-41.  For good reason, the per se rule dispenses with any such considerations, reflecting the Supreme Court's "longstanding judgment that the prohibited practices by their nature have a substantial potential for impact on competition." *SCTLA*, 493 U.S. at 433 (internal quotation marks omitted).  "The *per se* rule would collapse if every claim of economies from restricting competition, however implausible, could be used to move a horizontal agreement not to compete from the per se to the Rule of Reason category." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 595 (7th Cir. 1984).

Defendants' reliance on *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984), and *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979), is entirely misplaced.  In deciding not to apply the per se rule to NCAA policies concerning the broadcasting of college football, the Court explained that "what is critical is that this case involves an industry in which

16

horizontal restraints on competition are *essential* if the product is to be available at all." *NCAA*, 468 U.S. at 101 (emphasis added).  Likewise, "the Supreme Court recognized in *Broadcast Music* . . . that certain products require horizontal restraints, including horizontal price-fixing, in order to exist at all." *Law v. NCAA*, 134 F.3d 1010, 1017 (10th Cir. 1998); *see Broadcast Music*, 441 U.S. at 20-22 (declining to apply per se rule to blanket music license that constituted a "different product" in light of "obvious necessity" to avoid thousands of individual license negotiations).  Defendants make no similar claim regarding the conduct alleged in the indictment (nor could they), and the district court did not suggest any such rationale.

## B. Defendants' Factual Assertions Would Not Support an Ancillary Restraints Theory of Defense, and Even If They Offered an Adequate Factual Basis for the Theory, It Is for the Jury to Resolve at Trial

There is no merit to defendants' argument that their customer allocation agreement was ancillary to a legitimate joint venture and must therefore be analyzed under the rule of reason.  Nothing in defendants' brief (or their arguments before the district court) supports application of the ancillary restraints doctrine, or even suggests that

their allocation agreement is anything more than a naked horizontal agreement to eliminate competition. And the court erred in entertaining defendants' claimed factual dispute before trial. Defendants may offer evidence at trial that their agreement was not a naked customer allocation, but rather ancillary to a legitimate collaboration, and the government will offer witness testimony that the agreement was not ancillary. If the jurors find that the government failed to prove the naked allocation, they will be obliged to acquit. By resolving that issue before trial, however, the district court "trespassed on territory reserved to the jury as the ultimate finder of fact in our criminal justice system." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010).

   1. <u>The ancillary restraints doctrine does not support the decision below</u>. A restraint is ancillary—and thus falls outside the per se rule—when it is "subordinate and collateral to a separate, legitimate transaction." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986). To be "ancillary," a restraint must serve "to make the main transaction more effective in accomplishing its purpose." *Id.*

18

Defendants fail to identify any "separate, legitimate transaction" to which the customer allocation was supposedly "subordinate and collateral." As defendants describe the arrangement, "when one [party to the agreement] contacted an unsigned heir that was also contacted by the other [party to the agreement], the two companies split the case from that point forward." Opp. 9. In other words, defendants collaborated with their competitors to eliminate competition whenever competition arose, but did not collaborate if there was no competition to eliminate. Based on defendants' own description of their conduct, the customer allocation agreement was "the essential reason for the competitors' cooperation" and not in any sense "merely ancillary to" the operation of a legitimate joint venture. *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 964 (10th Cir. 1994).

Defendants refer to *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185 (7th Cir. 1985), but that decision only illustrates the hole in their argument. In *Polk Bros.*, a retailer of appliances and home furnishings and a retailer of building materials and lumber jointly built and operated a small shopping center where each had a store. 776 F.2d at 187. To make their venture work, the retailers agreed not to compete

19

at these stores in each other's core product lines. *Id.*  The Seventh Circuit concluded that the product allocation agreement was "ancillary"—and thus subject to the rule of reason—because it was reasonably necessary to the larger productive endeavor of building the shopping center. *Id.* at 188-90.

Defendants cannot legitimately claim any comparable collaboration. By their own admission, defendants did not collaborate in researching estates or identifying heirs.  Each firm expended its own resources to identify an heir, and then—only when faced with competition—agreed to eliminate it.  Although defendants argue that their arrangement enabled them to "integrate their efforts going forward, specifically in administering the probate process of the estate" at issue, Opp. 51 (quoting A135), merely eliminating duplication as to that estate by, for example, hiring the same outside counsel to administer it, does not amount to a "separate, legitimate transaction." *Rothery Storage*, 792 F.2d at 224.

Moreover, defendants' allocation agreement was not reasonably necessary to achieve the goal of some larger endeavor, as *Polk Bros.* requires.  Defendants concede that they did not eliminate "unnecessary

20

duplication" on heirs they had not allocated.  Opp. 52 ("[P]reviously

signed heirs were not subject to the agreement.").  Nothing prevented

the conspirators from competing on the merits for heirs and then hiring

the same counsel or otherwise collaborating to administer the estate.

Any elimination of administrative costs was, at most, subordinate and

incidental to the agreement not to compete, not the other way around.

Although defendants point to their sharing of revenue from the

allocated estates as evidence of a larger collaboration, Opp. 43-44, the

Supreme Court has made clear that the per se rule applies to an

allocation scheme even if its participants share revenue.  In *Palmer v.

BRG of Georgia, Inc.*, 498 U.S. 46 (1990), the leading provider of bar

review courses agreed not to offer courses in Georgia, and BRG agreed

not to offer courses outside Georgia.  The Court acknowledged that BRG

was granted an exclusive license to market the leading provider's

Bar/Bri materials in Georgia, for which it paid that provider $100 per

enrollee plus a 40% share of revenue over $350, *id.* at 46-47, but this

revenue sharing did not save the agreement from condemnation under

the per se rule or prevent the Court from summarily reversing the

Eleventh Circuit for failing to apply the per se rule.  *Id.* at 49.

Ultimately, what defendants characterize as revenue sharing is nothing more than a system of payoffs for their agreement not to compete.  A cartel often generates additional profits for its members. That the conspirators shared those profits, or used them to generate more business, *see* Opp. 53, is no defense.  "A restraint cannot be justified solely on the ground that it increases the profitability of the enterprise." *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 38 (D.C. Cir. 2005).

2.  <u>Any possible ancillary restraints defense should await trial</u>. Even assuming some evidence supports an ancillary restraints defense, that evidence should be presented at trial, not evaluated at the pretrial stage.  The government charged defendants with engaging in a naked customer allocation with a competitor and must prove that naked agreement beyond a reasonable doubt at trial.  Defendants may present evidence to the contrary, including evidence that the challenged agreement was ancillary to a legitimate joint venture.  If the jury finds that the government failed to carry its burden, defendants will be acquitted.  The Federal Rules of Criminal Procedure do not permit the district court to short-circuit this process.

"An indictment . . . , if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). On "a motion to dismiss an indictment, the question is not whether the government has presented sufficient evidence to support the charge, but solely whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offense." *United States v. Todd*, 446 F.3d 1062, 1068 (10th Cir. 2006). The indictment here charges defendants with entering into a naked agreement to allocate customers, which is a per se violation of Section 1 of the Sherman Act. *Suntar Roofing*, 897 F.2d at 473. The grand jury's charge that defendants engaged in customer allocation was sufficient to call for a trial on the merits.

Defendants cannot seriously contend that the indictment fails to describe an agreement to allocate customers, and they fail to identify any deficiency on the face of the indictment that could render it insufficient to allege such an agreement. Rather, they argue—based on their own version of the facts—that the alleged agreement "function[s] as a productive joint venture to which any customer allocation was ancillary." Opp. 55. But "Rule 12 authorizes the district court to

23

resolve before trial only those motions 'that the court can determine without a trial of the general issue,'" which is "defined as 'evidence relevant to the question of guilt or innocence.'" *Pope*, 613 F.3d at 1259. "If contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *Id*.

The district court exceeded its authority and resolved factual disputes going to guilt or innocence.  As defendants concede, the court "looked beyond the government's allegations . . . to examine the substance of" defendants' conduct.  Opp. 40.  But pretrial, "the question is not whether the government has presented sufficient evidence to support the charge, but solely whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offense." *Todd*, 446 F.3d at 1068.  The court was "bound by the factual allegations contained within the four corners of the indictment." *United States v. Welch*, 327 F.3d 1081, 1090 (10th Cir. 2003).

Defendants cite several cases in which district courts considered defense proffers in ruling on the admissibility of certain defenses, Opp. 58, but—contrary to defendants' characterization—the decision below

24

was not merely "a pretrial determination about the evidence and arguments" that will be permitted at trial. *Id.* It was an erroneous pretrial determination that defendants had not engaged in the per se unlawful agreement charged in the indictment.

Defendants also incorrectly assert that the district court appropriately evaluated evidence outside the indictment because it was "essentially undisputed." *Id.* (quoting *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994)). But the government disputed defendants' contentions and objected to pretrial consideration of the defendants' purported evidence at every opportunity. A56-57, A97-98, A239, A250. While defendants argue that there was no dispute because the government did not "specifically dispute these facts or proffer any to the contrary," Opp. 48 n.19, their suggestion that the government "was required to" proffer specific facts in response in order to demonstrate a "dispute," *id.*, would import the standard for summary judgment in civil cases—Fed. R. Civ. P. 56—into criminal pretrial procedure. There are no "summary judgment procedures" in criminal cases, *Pope*, 613 F.3d at 1259-61, and defendants' request for an "evidentiary hearing" on the merits of the government's case is equally inappropriate, *id.* at 1260.

Lastly, defendants suggest that forcing a court to test the sufficiency of an indictment alleging a per se violation based on the indictment's allegations would mean that "the defense's hands—and the Court's— are tied." Opp. 41. This remarkable suggestion fundamentally denies the jury's role in deciding questions of guilt. It is juries—not courts— that are "charged with determining the general issue of a defendant's guilt or innocence," *Pope*, 613 F.3d at 1259, and the government does not dispute that defendants can present any relevant evidence to the jury, including any evidence that their agreement did not violate Section 1's per se rule because it is an ancillary restraint. Defendants' argument that the court must be permitted to weigh evidence and determine their guilt in advance of trial lest the court's hands be "tied," Opp. 41, is contrary to the foundation of our criminal justice system— trial by jury.

### C. The Rule of Lenity Does Not Apply

Defendants are wrong to claim that the rule of lenity "[m]ilitates [a]gainst" the per se rule when there is a "close" question whether the conduct violates the per se rule, Opp. 56. But even assuming it is a close factual question whether a defendant's conduct violates a

substantive rule of law (which it is not here, *see supra* pp. 10-26), lenity

would not require application of a different substantive rule of law to

that conduct.  Rather, the "rule of lenity only applies if, after

considering text, structure, history, and purpose, there remains a

grievous ambiguity or uncertainty in the statute such that the Court

must simply guess as to what Congress intended." *Barber v. Thomas*,

560 U.S. 474, 488 (2010) (citation and internal quotation marks

omitted); *see Lockhart v. United States*, 136 S. Ct. 958, 968 (2016) (The

"lenity principle" is used "to resolve ambiguity in favor of the defendant

only 'at the end of the process of construing what Congress has

expressed' when the ordinary canons of statutory construction have

revealed no satisfactory construction.").  Section 1 of the Sherman Act

presents no such ambiguity.  Considering its text, structure, history,

and purpose, courts have consistently construed Section 1 to

categorically criminalize certain restraints, including agreements to fix

prices, rig bids, and allocate customers.  *United States v. Socony-*

*Vacuum*, 310 U.S. 150, 218 (1940); *Reicher*, 983 F.2d at 171; *Suntar*

*Roofing*, 897 F.2d at 473; *see SCTLA*, 493 U.S. at 432-33 (explaining

that "per se rules are, of course, the product of judicial interpretations of the Sherman Act").

### D. 18 U.S.C. § 3731 Provides Appellate Jurisdiction To Review the Per Se Issue, and If Not, Mandamus Is Appropriate

1. <u>Section 3731 provides appellate jurisdiction.</u>  Defendants' jurisdictional argument begins with the false premise that there continues to be a presumption against government appeals in criminal cases.  Opp. 29.  But that premise is a relic that has been "reverse[d]." *United States v. Bloom*, 149 F.3d 649, 652 (7th Cir. 1998), *abrogated on other grounds*, *Skilling v. United States*, 561 U.S. 358 (2010); *see* Br. 47-49.  As this Court recognized in *United States v. Delatorre*, "[w]hile a presumption against Government appeals in criminal cases historically existed, today the Government may initiate an appeal if the Constitution permits and specific statutory authority so provides."  157 F.3d 1205, 1208 (10th Cir. 1998).  And Section 3731 itself provides that it shall be "liberally construed."  18 U.S.C. § 3731.

Here, the government charged a per se unlawful agreement, and the district court barred the government from proceeding to trial on that per se theory.  While defendants attempt to characterize that erroneous

28

decision as merely a "pretrial ruling" on the evidence and argument permitted at trial, Opp. 32, the per se rule and the rule of reason are "two distinct rules of substantive law" that define a violation of the Sherman Act. *United States v. Mfrs.' Ass'n of Relocatable Bldg. Indus.*, 462 F.2d 49, 52 (9th Cir. 1972). To be sure, pursuing one rule over another affects the evidence and arguments permitted at trial, but "the substantive rules of antitrust are no more rules of evidence than the substantive rules of any legal area." *Id.* It is the prosecutor's prerogative to choose the substantive rule of law to charge in an indictment. *United States v. Schneider*, 594 F.3d 1219, 1225 (10th Cir. 2010) ("A judge in our system does not have the authority to tell prosecutors which crimes to prosecute or when to prosecute."). When, as here, a district court bars the government from proceeding to trial on that charge, this Court has jurisdiction to review that decision.

Defendants argue that the per se rule cannot be a discrete theory of liability, the dismissal of which would satisfy Section 3731, if the government could not have drafted the indictment to include separate counts under the per se rule and the rule of reason. Opp. 33. That is not the test. As the First Circuit explained in *United States v.*

29

*Levasseur*, 846 F.2d 786, 790 (1st Cir. 1988), a "rigid requirement" that what is stricken from an indictment must have been "able to stand as a separate count, legally and logically, in the same indictment" is "contrary to the congressional intent" behind Section 3731. The test is whether what was stricken from the indictment provides a discrete basis for the imposition of criminal liability. The per se rule unquestionably provides a discrete basis for a violation of the Sherman Act. *Cf. Nat'l Soc. Of Prof'l Engineers v. United States*, 435 U.S. 679, 692 (1978) (identifying "two" distinct but "complementary categories of antitrust analysis").

2. <u>If Section 3731 does not apply, mandamus is appropriate</u>. The government's opening brief explained why the criteria for issuance of a writ of mandamus are satisfied here. *See* Br. 53-57. The defendants' argument that, of the five factors that can guide a courts' consideration, "[n]one weighs in the government's favor," Opp. 35, is plainly mistaken. The "five 'nonconclusive guidelines,'" *United States v. McVeigh*, 119 F.3d 806, 810 (10th Cir. 1997), support the writ.

Defendants do not dispute that the "first two factors" are met because the government (1) has no alternative means to secure relief

30

and (2) is damaged in a way not correctable on appeal (and indeed, their

Section 3731 argument depends on it).  They are wrong to claim these

factors deserve "little weight," Opp. 35.  In comparable circumstances,

this Court and others have put significant weight on the government's

inability to obtain relief on appeal in criminal cases.  *See* Br. 54-55.

Defendants' claim that mandamus should not be permitted in a

criminal case unless the challenged order has "the effect of a dismissal,"

Opp. 35 (quoting *Will v. United States*, 389 U.S. 90, 98 (1967)),

demonstrates their reliance on outdated law.  Were that true, the

government could never seek mandamus relief because Section 3731

authorizes appeals of effective dismissals, as defendants concede, Opp.

30, and this Court now recognizes, *Schneider*, 594 F.3d at 1225 (noting

a change in this Court's jurisprudence following the 2002 amendments

to Section 3731).  Moreover, in *McVeigh*, the Court stated that it was

not ruling out the possibility of mandamus in criminal cases, even with

procedural orders.  Br. 53 n.20.  In any event, as explained above, the

order has the practical effect of a dismissal.

    As to the third guideline, abuse of discretion, defendants are wrong

that the government is seeking error correction on a "complex and

31

difficult" issue for which "the answer is not easily discerned," Opp. 37

n.11.  To the contrary, the issue is straightforward and the district

court's error was obvious:  its decision contravened binding precedents

on the per se rule and on consideration of facts outside the indictment

that go to the question of guilt, *see* Br. 27-47.  Moreover, the district

court refused to correct these clear errors despite the government's

having identified them on reconsideration.  A87-A98.  Instead, it

permitted defendants to draft an order that misrepresented the record

by misstating that the government failed to object to consideration of

factual material, and adopted the order verbatim despite the

government's explicit objection to this misrepresentation.  A97-A98.

This was not mere error: it was a "patently erroneous" decision, *In re*

*Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008), from which

the government has demonstrated a "clear and indisputable" right to

relief.  *In re United States*, 578 F.3d 1195, 1199-1200 (10th Cir. 2009)

("[M]andamus is an appropriate means for the government to seek relief

in a criminal case when the district court has adopted a jury instruction

in advance of trial that 'clearly violate[s] the law.'")

Invoking the final two guidelines, the defendants wrongly suggest that mandamus is inappropriate unless the issue is (4) "often repeated" and (5) a "novel" question, Opp. 37.  But courts recognize that the five mandamus guidelines are "cumulative and proper disposition will often require a balancing of conflicting indicators." *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 655 (9th Cir. 1977).  If a district court patently errs by obviously contravening controlling precedents, it follows that the question it addressed was not novel (given the clear precedents) and is likely not often repeated (given courts seldom disobey clear precedents).  Correcting a patently erroneous order concerning the central issue in the case that would yield clearly incorrect jury instructions and evidentiary rulings, and permit impermissible arguments—all making it likely that the prosecution will result in a failure from which the government cannot appeal—is the kind of extraordinary situation that warrants a writ of mandamus.  *See In re United States*, 578 F.3d at 1199-200; *United States v. Wexler*, 31 F.3d 117, 128 (3d Cir. 1994).  That is the kind of correction the government seeks here, either through the writ of mandamus or reversal under Section 3731.

## CONCLUSION

This Court should reverse the order that the indictment is barred by the statute of limitations, reverse the order that the case is subject to the rule of reason (or, alternatively, issue a writ of mandamus directing the district court to apply the per se rule), and remand for trial.

Respectfully submitted.                    s/ Jonathan Lasken

                                     MAKAN DELRAHIM
                                       *Assistant Attorney General*

                                     ANDREW C. FINCH
                                       *Principal Deputy Assistant Attorney General*

                                     MARVIN N. PRICE, JR.
                                       *Acting Deputy Assistant Attorney General*

KALINA M. TULLEY              KRISTEN C. LIMARZI
ROBERT M. JACOBS             JAMES J. FREDRICKS
RUBEN MARTINEZ, JR.          ADAM D. CHANDLER
MOLLY A. KELLEY              JONATHAN H. LASKEN
  *Attorneys*                    *Attorneys*

  U.S. Department of Justice     U.S. Department of Justice
  Antitrust Division             Antitrust Division
                                 950 Pennsylvania Avenue, NW
                                 Room 3224
                                 Washington, DC 20530-0001
                                 202-353-6638

March 2, 2018

**CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitation of Federal

Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,491 words,

excluding the parts of the brief exempted by Federal Rule of Appellate

Procedure 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Federal

Rule of Appellate Procedure 32(a)(5) and the type-style requirements of

Federal Rule of Appellate Procedure 32(a)(6) because this brief has been

prepared in a proportionally spaced typeface using Microsoft Office

Word 2013 with 14-point New Century Schoolbook font.

March 2, 2018                                 s/ Jonathan Lasken
                                              *Attorney for the*
                                              *United States of America*

35

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made;

(2) that the ECF submission is an exact copy of the hard copies of this document that are to be filed with the court;

(3) the digital submission has been scanned for viruses with Symantec Endpoint Protection Version 12.1.6 build 7004 (12.1.7004.6500) with current protection definitions, dated March 1, 2018 r21, and according to the program is free of viruses.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

March 2, 2018

s/ Jonathan Lasken
*Attorney for the*
*United States of America*

36

## CERTIFICATE OF SERVICE

I, Jonathan Lasken, hereby certify that on March 2, 2018, I electronically filed the foregoing Reply Brief for the United States of America with the Clerk of the Court of the United States Court of Appeals for the Tenth Circuit by using the CM/ECF System.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

March 2, 2018                                      s/ Jonathan Lasken
                                                   *Attorney for the*
                                                   *United States of America*